# DESIGNATION OF RECORD ON APPEAL

## EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

**CHARLES PATRICK PRATT and**
**A.E.P. through her parents and next friends**
**Bobbi Lynn Petranchuk and Todd Edward**
**Petranchuk,**

                         Plaintiffs,

                                                        **NOTICE OF DEFENDANT**
                                                        **INDIAN RIVER CENTRAL**
                                                        **SCHOOL DISTRICT'S MOTION**
                                                       **IN LIMINE AND FOR**
                                                       **PROTECTIVE ORDER**
                                                      **Case No.: 7:09-cv-411 (GTS/GHL)**

      v.

**INDIAN RIVER CENTRAL SCHOOL**
**DISTRICT; INDIAN RIVER CENTRAL**
**SCHOOL DISTRICT BOARD OF**
**EDUCATION; JAMES KETTRICK,**
**Superintendent of Indian River Central School**
**District, in his official and individual**
**Capacities; TROY DECKER, Principal of**
**Indian River High School, in his official and**
**Individual capacities; and JAY BROWN,**
**JOHN DAVIS, KENDA GRAY, AMABLE**
**TURNER, PATRICIA HENDERSON, and**
**BRIAN MOORE in their individual capacities,**

                         Defendants.

_____

     **PLEASE TAKE NOTICE** that upon the annexed Affidavit of Charles C. Spagnoli

Supporting Defendant's Motion in Limine and for Protective Order dated April 23, 2012;

Affidavit of James Kettrick Supporting Defendant's Motion in Limine and for Protective Order

dated April 17, 2012; and Defendant's Memorandum of Law Supporting Motion in Limine and

for Protective Order, Defendant Indian River Central School District ("District") will move the

- 1 -

Court, at the James Hanley Federal Building, 100 South Clinton Street, Syracuse, New York, at 10:00 a.m. on June 21, 2012, or as soon thereafter as Defendant District may be heard, for an Order pursuant to Rules 402 and 403 of the Federal Rules of Evidence precluding introduction of matters in evidence at trial concerning alleged acts of discrimination or harassment occurring in or in the vicinity of a facility of the District – for example, the Indian River Central High School – at a time when Plaintiff Charles Pratt was not enrolled for instruction at and attending such facility (the "Non-Pratt Environment Evidence"); and for an Order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure protecting Defendants from further discovery, including written discovery or questions in depositions of parties or non-parties, concerning the Non-Pratt Environment Evidence.

Defendant requests the opportunity for oral argument upon the instant motion.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to Local Rule 7.1(b)(2) of the Court, answering papers, if any, shall be served on or before June 4, 2012.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to Local Rule 7.1(b)(2) of the Court, Defendant requests leave to submit reply papers by June 15, 2012.

Dated: April 24, 2012
    East Syracuse, New York

Respectfully submitted,

**The Law Firm of Frank W. Miller**

**s/Charles C. Spagnoli, Esq.**
Bar Roll No.:  507694
*Attorneys for Defendants*
*Indian River Central School District;*
*Indian River Central School District*
*Board of Education; James Kettrick,*
*Superintendent of Indian River*
*Central School District, in his*
*official and individual capacities;*
*Troy Decker, Principal of Indian*
*River High School, in his official and*
*individual capacities; and Jay*
*Brown, John Davis, Kenda Gray,*
*Amable Turner, Patricia Henderson,*
*and Brian Moore, in their individual*
*capacities*
Office and Post Office Address:
6575 Kirkville Road
East Syracuse, New York  13057
Telephone:  315-234-9900
Facsimile:  315-234-9908
**cspagnoli@fwmillerlawfirm.com**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

**CHARLES PATRICK PRATT and**
**A.E.P. through her parents and next friends**
**Bobbi Lynn Petranchuk and Todd Edward**
**Petranchuk,**

                                    **CERTICATE OF SERVICE**
                    Plaintiffs,     **Case No.: 7:09-cv-411**
                                    **(GTS/TWD)**

        v.

**INDIAN RIVER CENTRAL SCHOOL**
**DISTRICT; INDIAN RIVER CENTRAL**
**SCHOOL DISTRICT BOARD OF**
**EDUCATION; JAMES KETTRICK,**
**Superintendent of Indian River Central School**
**District, in his official and individual**
**Capacities; TROY DECKER, Principal of**
**Indian River High School, in his official and**
**Individual capacities; and JAY BROWN,**
**JOHN DAVIS, KENDA GRAY, AMABLE**
**TURNER and PATRICIA HENDERSON, in**
**their individual capacities,**

                    Defendants.

_____

STATE OF NEW YORK          )
COUNTY OF ONONDAGA  )  ss.:

        I hereby certify that on April 24, 2012, I electronically filed the following: **Notice of**
**Defendant Indian River Central School District's Motion in Limine and for Protective**
**Order; Affidavit of James Kettrick Supporting Defendant's Motion in Limine and for**
**Protective Order; Affidavit of Charles C. Spagnoli Supporting Defendant's Motion in**
**Limine and for Protective Order; and Defendant's Memorandum of Law Supporting**
**Motion in Limine and for Protective Order** with the Clerk of the District Court using the
CM/ECF system, which sent notification of such filing to the following:

Hayley J. Gorenberg, Esq.
Attorneys for the Plaintiffs
Lambda Legal Defense and Education Fund
120 Wall Street, Suite 1500
New York, NY  10005
hgorenberg@lambdalegal.org
*Via electronic filing*

Thomas W. Ude, Jr., Esq.
Attorneys for the Plaintiffs
Lambda Legal Defense and Education Fund
120 Wall Street, Suite 1500
New York, NY  10005
tude@lambdalegal.org
*Via electronic filing*

Adam T. Humann, Esq.
Attorneys for the Plaintiffs
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY  10022
adam.humann@kirkland.com
*Via electronic filing*

Maura M. Klugman, Esq.
Attorneys for the Plaintiffs
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY  10022
maura.klugman@kirkland.com
*Via electronic filing*

Alexandra P. Kolod, Esq.
Attorneys for the Plaintiffs
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY  10022
alexandra.kolod@kirkland.com
*Via electronic filing*

Vickie Reznik, Esq.
Attorneys for the Plaintiffs
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY  10022
vickie.reznik@kirkland.com
*Via electronic filing*

Robert Gretch, Esq.
Attorneys for the Plaintiffs
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY  10022
robert.gretch@kirkland.com
*Via electronic filing*

Lisa Lecointe-Cephas, Esq.
Attorneys for the Plaintiffs
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY  10022
lisa.lecointe-cephas@kirkland.com
*Via electronic filing*

s/ Charles C. Spagnoli, Esq.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

**CHARLES PATRICK PRATT and**
**A.E.P. through her parents and next friends**
**Bobbi Lynn Petranchuk and Todd Edward**
**Petranchuk,**

                Plaintiffs,

                                       **Case No.: 7:09-cv-411 (GTS/GHL)**

       v.

**INDIAN RIVER CENTRAL SCHOOL**
**DISTRICT; INDIAN RIVER CENTRAL**
**SCHOOL DISTRICT BOARD OF**
**EDUCATION; JAMES KETTRICK,**
**Superintendent of Indian River Central School**
**District, in his official and individual**
**Capacities; TROY DECKER, Principal of**
**Indian River High School, in his official and**
**Individual capacities; and JAY BROWN,**
**JOHN DAVIS, KENDA GRAY, AMABLE**
**TURNER, PATRICIA HENDERSON, and**
**BRIAN MOORE in their individual capacities,**

                Defendants.

---

## DEFENDANT'S MEMORANDUM OF LAW SUPPORTING MOTION IN LIMINE AND FOR PROTECTIVE ORDER

---

                                Submitted by
               **THE LAW FIRM OF FRANK W. MILLER**
                  **Charles C. Spagnoli, Esq.**
                   Bar Roll No.: 507694
                  *Attorneys for Defendants*
          *Indian River Central School District, et. al.*
             Office and Post Office Address:
                 6575 Kirkville Road
             East Syracuse, New York 13057
              Telephone: (315) 234-9900
              Facsimile: (315) 234-9908
           cspagnoli@fwmillerlawfirm.com

Dated:  April 24, 2012

## Table of Contents

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

   1.   Plaintiffs' Claims. ......................................................................................... 2

   2.   Plaintiffs' Attendance at Schools in the District. ........................................... 3

   3.   Allegations in the Plaintiffs' Complaints Regarding Non-Pratt Environment Evidence. ... 4

   4.   Plaintiffs' Discovery Demands and Deposition Questions Regarding Non-Pratt Environment Evidence. ............................................................................... 4

   5.   Examples of Incidents Constituting Non-Pratt Environment Evidence. ............. 6

   6.   The Admissibility of the Non-Pratt Environment Evidence Should be Determined Now to Inform Discovery and Protect Defendants from Imminent Prejudice. ...................................... 6

ARGUMENT ......................................................................................................... 7

I.   THE NON-PRATT ENVIRONMENT EVIDENCE SHOULD NOT BE ADMITTED AT TRIAL AS IT IS NOT RELEVANT TO PLAINTIFFS' CLAIMS ............................................. 7

   A.   The Non-Pratt Environment Evidence is Not Relevant to Plaintiff Pratt's Claims of Discrimination, Harassment, and a Hostile Environment. ............................................. 7

   B.   The Non-Pratt Environment Evidence is Not Relevant to Plaintiffs' Claims that Their Requests to Form a GSA were Improperly Denied. ............................................. 14

II.   THE NON-PRATT ENVIRONMENT EVIDENCE SHOULD NOT BE ADMITTED AT TRIAL BECAUSE OF ITS POTENTIAL FOR PREJUDICE, CONFUSION OF THE ISSUES, AND MISLEADING THE JURY ......................................................................... 18

III.   THE NON-PRATT ENVIRONMENT EVIDENCE SHOULD BE EXCLUDED FROM DISCOVERY AS IRRELEVANT AND UNLIKELY TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE ......................................................................... 20

IV.   A DETERMINATION OF THE ADMISSIBILITY OF THE NON-PRATT ENVIRONMENT EVIDENCE IS NEEDED NOW TO PREVENT PREJUDICE AND WASTE OF TIME ......................................................................... 21

CONCLUSION ..................................................................................................... 23

## TABLE OF AUTHORITIES

**Cases**

*Albany College of Pharmacy of Union University,* 633 F.3d 81 (2d Cir. 2011) ........................... 8

*Alexander v. City of New York,* 2004 WL 1907432 (S.D.N.Y. 2004) ......................................... 9

*Armbruster v. Unisys Corp.,* 914 F.Supp. 1153 (E.D.Pa. 1996)........................................... 16, 19

*Bartniak v. Cushman & Wakefield,* 223 F.Supp.2d 524 (S.D.N.Y. 2002)..................................... 9

*Blancha v. Raymark Industries,* 972 F.2d 507 (3d Cir. 1992) ............................................... 19

*Bliss v. Putnam Valley Central School District,* 2011 WL 1079944 (S.D.N.Y. 2011) ............... 13

*Board of the County Commissions of Bryan County, Oklahoma v. Brown,* 20 U.S. 397, 117 S.Ct. 1382 (1997)............................................................................................................... 13

*Childress v. City of Richmond,* 134 F.3d 1205 (4th Cir. 1998) ................................................. 7

*Davis v. Monroe County Board of Education,* 526 U.S. 629, 119 S.Ct. 1661 (1999)................... 8

*DT v. Somers Central School District,* 348 Fed.Appx. 697, 2009 WL 3316419 (2d Cir. 2009)... 9, 11

*Good News Club v. Milford Central School,* 533 U.S. 98, 121 S.Ct. 2093 (2001) ..................... 17

*Leibovitz v. New York City Transit Authority,* 252 F.3d 179 (2d Cir. 2001) ....................... 8, 9, 10

*McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70 (2d Cir. 2010)................................................. 9

*Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998 (1998)...................... 8

*Patenaude v. Salmon River Central School District,* 2005 WL 6152380 (N.D.N.Y. 2005) ......... 8

*Ricciuti v. New York City Transit Authority,* 941 F.2d 119 (2d Cir. 1991) ............................... 13

*Schwapp v. Town of Avon,* 118 F.3d 106 (2d Cir. 1997) .......................................................... 8

*Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625 (1983)......................................................... 14

*Sprint/United Management Co. v. Mendelsohn,* 552 U.S. 379, 128 S.Ct. 1140 (2008)............... 8

*Swift v. Mauro,* 2008 WL 274906 (N.D.N.Y. 2008) .......................................................... 16, 19

*U.S. v. Massino,* 546 F.3d 123 (2d Cir. 2008) ...................................................................... 18

*U.S. v. Ravich,* 421 F.2d 1196 (2d Cir. 1970)....................................................................... 19

*Villante v. Department of Corrections of the City of New York,* 786 F.2d 516 (2d Cir. 1986) .... 13

*Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197 (1975)............................................................ 15

*Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62 (2d Cir. 2000) ................................ 8

**Statutes**

42 U.S.C. § 1983.............................................................................................................. 13, 14

Equal Access Act ......................................................................................................... 14, 15, 17

Equal Protection Clause....................................................................................................... 14

First Amendment ........................................................................................................ 14, 15, 17

New York Civil Rights Law § 40-c ..................................................................................... 15, 17

**Rules**

Rule 26 of the Federal Rules of Civil Procedure ................................................................. 20, 21

Rule 403 of the Federal Rules of Evidence ............................................................................. 18

Rule 404(b) of the Federal Rules of Evidence.......................................................................... 14

Rules 401 and 402 of the Federal Rules of Evidence ................................................................. 7

## INTRODUCTION

Plaintiff Charles Pratt claims that he suffered discrimination and/or harassment during his enrollment in the Indian River Central School District ("District"). The First Amended Complaint, however, includes allegations of discrimination and harassment against students at the Indian River High School in 1998 and even in 1994, more than eight years before Plaintiff Pratt entered high school.[1] Plaintiffs have further pursued written discovery pertaining to student disciplinary matters going back to 1990, when Plaintiff Pratt was two years old.[2] Plaintiffs' counsel have also sought information in depositions regarding discrimination and harassment over the last twenty-eight years – that is, from a decade before to seven years after Plaintiff Pratt's attendance in the District.[3]

It is respectfully submitted that alleged harassment and discrimination occurring in a building when Plaintiff Pratt was not a student in the building (hereinafter "Non-Pratt Environment Evidence") is not relevant to his claims of discrimination and/or harassment. More specifically defined, the Non-Pratt Environment Evidence includes:

- Alleged incidents occurring before Plaintiff Pratt commenced school in the District (i.e., prior to the 1993-1994 school year);

- Alleged incidents during Plaintiff Pratt's attendance in the District (1993 to October, 2004) which occurred in a different school building than the one he was attending; and

- Alleged incidents occurring after Plaintiff Pratt withdrew from the District (i.e., after October, 2004).

---

[1] First Amended Complaint, ¶¶ 105-112.

[2] Affidavit of Charles C. Spagnoli Supporting Defendant's Motion in Limine and for Protective Order ("CCS Aff."), ¶ 5.

[3] CCS Aff., ¶¶ 10-11.

1

Admission of such evidence at trial would create an undue risk of prejudice to Defendants.  A ruling regarding the admissibility of such evidence is necessary now because an early determination will shape the course of discovery going forward, potentially eliminating the need for certain depositions and protecting Defendants from undertaking a nearly impossible task in discovery.

Defendants therefore seek an order in limine prohibiting the introduction of such evidence at trial and an order of protection precluding further discovery concerning the Non-Pratt Environment Evidence.

## BACKGROUND

### 1.     Plaintiffs' Claims.

On or about April 8, 2009, Plaintiff Pratt and Plaintiff Ashley Petranchuk (a/k/a "AEP") filed their original Complaint.  On or about February 18, 2010, Plaintiffs filed their First Amended Complaint.  Both the Complaint and the First Amended Complaint presented claims under various theories alleging, broadly speaking, three categories of alleged wrongful conduct: (1) certain Defendants failed to protect Plaintiff Pratt from experiencing discrimination and/or harassment during the time he attended schools in the District; (2) Defendant James Kettrick improperly rejected Plaintiff Pratt's requests to form a gay-straight alliance (or "GSA") at the Indian River High School ("High School"); and (3) Defendants Jay Brown and Troy Decker improperly rejected Plaintiff AEP's requests to form a GSA at the High School.

## 2.   Plaintiffs' Attendance at Schools in the District.

Plaintiff Pratt attended schools in the District from 1993 to October, 2004.  Specifically, Plaintiff Pratt attended the following schools in the listed periods:[4]

| | |
|---|---|
| Theresa Primary School | Fall, 1993-Spring, 1996 |
| Evans Mills Primary School | Fall, 1996-Spring, 1998 |
| Indian River Middle School | Fall, 1998-Spring, 2002[5] |
| Indian River High School | Fall, 2002-January, 2004;<br>September, 2004-October, 2004[6] |

The District enrolls roughly two hundred and sixty students per class year.[7]  Even assuming zero turnover in students – an assumption that is false[8] - Plaintiff Pratt would have shared a District building at one point or another with approximately one thousand eight hundred and twenty (1,820) different students.[9]

Plaintiff AEP attended schools in the District from 2000 through 2011, including the High School from the 2007-2008 school year to the 2010-2011 school year.[10]

---

[4] There is no information suggesting Plaintiff Pratt ever attended summer school, and thus the attendance periods listed are not intended to include summer periods outside the regular school year.

[5] For a brief period in September, 2001 Plaintiff Pratt attended a school outside the District, but he resumed attending the Indian River Middle School before the end of September, 2001.  See Transcript of Deposition of Charles Pratt ("Pratt Dep."), p. 41.  Copies of relevant pages from the Pratt Dep. are attached as Exhibit D to the CCS Aff.

[6] See First Amended Complaint, ¶¶ 20, 33, 37, 53; Pratt Dep., pp. 41, 50, 57-59.

[7] See Affidavit of James Kettrick Supporting Defendant's Motion in Limine and for Protective Order ("Kettrick Aff."), ¶ 3.

[8] Kettrick Aff., ¶ 4.

[9] For example, when he entered the Middle School in Fall, 1998, Plaintiff Pratt was a member of the Class of 2006, and would have shared the Middle School with the Classes of 2003, 2004, 2005, and 2006.  Each year as he advanced through the Middle School an older class would have moved to the high school and a younger class would have entered the Middle School, until in Spring, 2002, he shared the middle school with the Classes of 2006, 2007, 2008, and 2009.  Thus, he shared a District building with seven different class years, totaling approximately 2,100 students over time.

[10] See First Amended Complaint, ¶ 94; Transcript of Deposition of Ashley Petranchuk ("AEP Dep."), pp. 50-51.  Copies of relevant pages from the AEP Dep. are attached as Exhibit E to the CCS Aff.

3

### 3.   Allegations in the Plaintiffs' Complaints Regarding Non-Pratt Environment Evidence.

Notwithstanding that Plaintiff Pratt is the only plaintiff claiming to have experienced discrimination, harassment, or a hostile environment based on any protected characteristic, the First Amended Complaint included allegations that two students had experienced discrimination and harassment years before Plaintiff Pratt entered the High School in 2002. Thus, the First Amended Complaint alleged that Taunee Grant, a 1994 graduate, and Matthew Deem, a 1998 graduate, had each experienced discrimination and harassment.[11] Notably, Plaintiff Pratt has admitted he never met either Ms. Grant or Mr. Deem, and was never in the same building with either of them.[12]

### 4.   Plaintiffs' Discovery Demands and Deposition Questions Regarding Non-Pratt Environment Evidence.

Plaintiffs served written interrogatories and production requests demanding that Defendants disclose information relating to disciplinary issues and incidents covering 1990 to the present, without regard to whether Plaintiff Pratt was attending school where the discipline or incident occurred, or even whether Plaintiff Pratt was enrolled in the District at the time.[13] In response to those demands, Defendants produced approximately 8,500 pages of documents and substantial information which had no apparent relation to Plaintiffs' claims, at great cost to the District in terms of attorney's fees and District personnel resources.[14]

In response to written interrogatories posed by Defendant Indian River Central School District Board of Education ("Board"), Plaintiff Pratt set forth dozens of alleged items purporting

---

[11] First Amended Complaint, ¶¶ 105-112.

[12] Pratt Dep., pp. 234-235.

[13] CCS Aff., ¶ 5.

[14] *Id.,* ¶ 6.

4

to support his harassment-related claims, covering the entire period of his attendance at schools in the District from 1993 to October, 2004.[15]

In a deposition of Defendant James Kettrick, Plaintiffs' counsel asked extensive questions regarding incidents of alleged discrimination during Defendant Ketrick's tenure as principal of the High School, which began in 1993 – approximately nine years before Plaintiff Pratt entered the High School.[16]

In a deposition of Defendant Jay Brown, Plaintiffs' counsel asked extensive questions of Defendant Jay Brown regarding incidents of alleged discrimination during Defendant Brown's tenure as assistant principal of the High School.  Notably, Defendant Brown had testified that he was assistant principal from Fall, 2006 to Spring, 2009, and thus the information sought by these questions concerned alleged events occurring between two and four and a half years after October, 2004, the last time Plaintiff Pratt attended school in the District.[17]  Plaintiffs' counsel's questions did not stop there, however; he questioned Defendant Brown about incidents of alleged discrimination during Defendant  Brown's entire period of employment with the District – a span of some twenty-eight years.[18]  Thus, Plaintiffs' counsel sought information from Defendant Brown going back as much as nine years before Plaintiff Pratt attended any school in the District, and, indeed, four years before he was born.[19]

---

[15] *Id.,* ¶ 7.

[16] Transcript of Deposition of James Kettrick ("Kettrick Dep."), pp. 133, 231-236.  Copies of  relevant pages from the Kettrick Dep. are attached as Exhibit F to the CCS Aff.

[17] Transcript of Deposition of Jay Brown ("Brown Dep."), pp. 16-17.  Copies of  relevant pages from the Brown Dep. are attached as Exhibit G to the CCS Aff.

[18] *Id.*

[19] Defendants' counsel objected to such questioning and attempted to convene a conference call with the Court.  Unfortunately, neither the magistrate judge nor the judge assigned to this case was available, and the parties instead were afforded the opportunity to discuss the issue with Magistrate Judge Andrew Baxter.  Judge Baxter limited his ruling to the deposition of Defendant Brown and said that Plaintiffs' counsel could ask the questions at issue, but subject to Defendants' objections as to relevance.  He further said the parties could revisit the issue with the regularly-assigned magistrate and/or judge on the case.  *Id.,* ¶ 12.

5.      **Examples of Incidents Constituting Non-Pratt Environment Evidence.**

The category of Non-Pratt Environment Evidence would include the following:

- A student using an antigay slur against another student in 1987 (i.e., a year before Plaintiff Pratt's birth);

- Incidents of alleged discrimination against Ms. Grant, with whom Plaintiff Pratt never met and never shared a school building, in 1994 when Ms. Grant was at the High School and Plaintiff Pratt was attending kindergarten at the Theresa Primary School, eight miles away;

- Incidents of alleged discrimination against Mr. Deem, with whom Plaintiff Pratt never met and never shared a school building, in 1998 when Mr. Deem was at the High School and Plaintiff Pratt attended fourth grade at the Evans Mills Primary School, six and a half miles away; and

- A student punching another student in 2008, allegedly because the victim's behavior did not conform to gender stereotypes, where neither student ever shared a school building with Plaintiff Pratt and the incident occurred four years after Plaintiff Pratt withdrew from the District.

These examples reflect and typify the lack of connection between the Non-Pratt Environment Evidence and Plaintiff Pratt's experience in the District.

6.      **The Admissibility of the Non-Pratt Environment Evidence Should be Determined Now to Inform Discovery and Protect Defendants from Imminent Prejudice.**

Defendants now present their motion for a protective order and motion in limine to preclude discovery regarding the Non-Pratt Environment Evidence and exclude evidence and testimony concerning the Non-Pratt Environment Evidence at trial.

It is respectfully submitted that a determination regarding the admissibility of such evidence should not be delayed until the traditional time for determining motions in limine (i.e., on the eve of trial) because that determination will have a powerful effect on the discovery process. To wit, certain depositions may be avoided that would otherwise have to be conducted (particularly those of Matthew Deem and Taunee Grant, who live in Pittsburgh, Pennsylvania and Washington, D.C. respectively, but likely others as well); various areas of questioning could

be eliminated or significantly narrowed in the course of depositions; and prejudice to the

Defendants in the discovery process (discussed in Point II below) would be prevented.[20]

## ARGUMENT

## I.     THE NON-PRATT ENVIRONMENT EVIDENCE SHOULD NOT BE ADMITTED AT TRIAL AS IT IS NOT RELEVANT TO PLAINTIFFS' CLAIMS

### A.     The Non-Pratt Environment Evidence is Not Relevant to Plaintiff Pratt's Claims of Discrimination, Harassment, and a Hostile Environment.

The Non-Pratt Environment Evidence is not relevant to Plaintiff Pratt's claims that he

experienced discrimination, harassment, or a hostile environment at the Indian River Central

School District, and it should not be admitted at trial.

Pursuant to Rules 401 and 402 of the Federal Rules of Evidence, to be admissible

evidence must be relevant, meaning it tends to "make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be

without the evidence."

The Non-Pratt Environment Evidence does not meet this test with respect to Plaintiff

Pratt's hostile environment claims.  Plaintiff Pratt cannot recover for discrimination or

harassment experienced solely by another individual and not directed at him, unless it somehow

formed part of a "hostile environment" Plaintiff Pratt allegedly experienced at the District.  *Cf.*

*Childress v. City of Richmond,* 134 F.3d 1205, 1207 (4th Cir. 1998) (white male police officers

lacked standing for harassment claim based on treatment of female and black police officers).

The Non-Pratt Environment Evidence is not relevant to Plaintiff Pratt's hostile environment

claim because it is not evidence pertaining to the environment *Plaintiff Pratt experienced.*

---

[20] *Id.,* ¶ 15.

7

At issue in this motion is the scope of what an individual can allege as "his environment." Of course, discrimination or harassment directed at an individual can be part of his environment. Discrimination or harassment directed at another person in the individual's presence has also been deemed part of the individual's environment. *See Schwapp v. Town of Avon,* 118 F.3d 106, 108, 111 (2d Cir. 1997) (incidents occurring in plaintiff's presence are part of workplace environment).[21]   Courts have reached differing conclusions on whether an individual can cite, as part of his "environment," acts of discrimination or harassment occurring at his workplace during his tenure, but of which the individual learned only secondhand.  *Compare Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 189 (2d Cir. 2001) (because plaintiff did not witness alleged harassment of other women herself, she could not recover for a hostile environment consisting of such harassment of other women) *with Schwapp, supra* (permitting evidence of harassment that was related to plaintiff secondhand as forming part of plaintiff's alleged hostile environment)*, and Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir. 2000) (secondhand reports of discriminatory comments can be evidence of hostile environment); *see also Sprint/United Management Co. v. Mendelsohn,* 552 U.S. 379, 128 S.Ct. 1140 (2008) (upholding district court's ruling that evidence of claims of discrimination of other employees at the hands of other supervisors was irrelevant to plaintiff's workplace discrimination claim, with instructions to clarify basis for ruling).

---

[21] Although courts have refused to import certain concepts (such as constructive notice) from the Title VII sphere, and further have recognized that student-to-student misconduct must rise to a higher level than workplace misconduct to create an actionable hostile environment, *Schwapp* and other cases from Title VII workplace discrimination caselaw are still recognized as instructive on the subject of evidence that may be relevant to demonstrate the existence of a hostile environment.  *See, e.g., Davis v. Monroe County Board of Education,* 526 U.S. 629, 651, 119 S.Ct. 1661, 1675 (1999) (citing, in Title IX student-on-student harassment case, *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998 (1998), a Title VII same-sex discrimination opinion, for principles of determining whether hostile environment exists); *Papelino v. Albany College of Pharmacy of Union University,* 633 F.3d 81, 89 (2d Cir. 2011) ("a Title IX hostile education environment claim is 'governed by traditional Title VII "hostile environment" jurisprudence'"); *Patenaude v. Salmon River Central School District,* 2005 WL 6152380, *5 (N.D.N.Y. 2005) ("[i]n analyzing Title IX harassment claims, courts frequently borrow from the body of law developed under Title VII").

8

However, even the most extreme and broad treatments of hostile environments have not permitted an individual to cite, as part of his "environment," acts of discrimination or harassment (1) occurring in another physical location than the individual frequented, or (2) occurring outside the individual's tenure, of which the individual did not learn during his tenure.  *See DT v. Somers Central School District,* 348 Fed.Appx. 697, 699-700, 2009 WL 3316419 (2d Cir. 2009) (e-mail concerning discrimination against another student, in another school in the district than that which plaintiff attended, was not evidence pertaining to harassment of plaintiff); *Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 189 (2d Cir. 2001) (incidents of harassment of women who worked in another part of employer's premises, out of plaintiff's sight, not relevant or admissible in hostile environment lawsuit); *Alexander v. City of New York,* 2004 WL 1907432 (S.D.N.Y. 2004) (in hostile environment lawsuit brought by male police officer, who worked primarily in various precinct offices of New York Police Department, experience of female police officer who worked in training and internal investigation units not relevant or admissible); *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 78 (2d Cir. 2010) (comment made by employee who worked in different department than plaintiff did not contribute to hostile environment); *Bartniak v. Cushman & Wakefield,* 223 F.Supp.2d 524, 533 (S.D.N.Y. 2002) (picture never brought into plaintiff's workplace was no part of plaintiff's environment and was not relevant or admissible).  Such events are so far removed from the individual's personal experience of discrimination that they cannot be reasonably deemed part of the individual's environment.

In *Leibovitz, supra,* the plaintiff was a female employee who sought to recover for hostile environment harassment.  She based her claim, in part, on reports by two other women that a supervisor had sexually harassed them.  However, the plaintiff "was not herself a target of the alleged harassment, was not present when the harassment supposedly occurred, and did not even

9

know of the harassment while it was ongoing." *Leibovitz, supra* at 190. The comments of the

Second Circuit in *Leibovitz* are particularly illuminating and merit extensive citation here:

> As the district court noted, "[i]t was conceded that much of the alleged harassment did not occur in plaintiff's immediate vicinity and much of what she knew about the situation was second- or third-hand" . . . . Even assuming that Leibovitz could claim to share the same "environment" – broadly conceived – as the women allegedly harassed, Leibovitz failed to demonstrate that their harassment adversely affected the terms and conditions of her own employment.
>
> *But, in any event, no such broad conception of the working environment is sustainable in this case.* The women who were allegedly harassed *were working in another part of the employer's premises, out of Leibovitz's sight and regular orbit;* they were doing another job, and were allegedly subjected to harassment by a supervisor who supervised them but did not supervise Leibovitz; the experiences of those women came to Leibovitz's notice via hearsay (and were not proved). In these circumstances, plaintiff cannot demonstrate that she suffered harassment either in subjective or objective terms. *In terms of the objective impact of the harassment alleged, that harassment might as well have been going on in a nearby office of another firm*, or been the subject of an infuriating newspaper article, or been a false rumor of a kind that would be upsetting if true.
>
>          \*   \*   \*
>
> The only way to characterize Leibovitz's environment as hostile or abusive is by expanding the concept of environment to include venues in which she did not work. Such a characterization would open the door to limitless employer liability, and allow a recovery by any employee made distraught by office gossip, rumor or innuendo.
>
> In short, Leibovitz presented no evidence that her own working environment was hostile, and failed to allege or prove that harassment of other women adversely affected the terms and conditions of her own employment.

*Leibovitz, supra* at 189-190 (emphasis added; internal citations and references omitted).

10

Similarly, in *DT v. Somers Central School District, supra,* the Second Circuit refused to consider an e-mail as providing notice to a school district of racial harassment of the plaintiff, stating, "even if complaints about discrimination against other students could provide actual notice to the school district, this case does not support such an inference because the proffered email concerns discrimination not only against a different student, *but at a different school in the district." DT v. Somers Central School District,* 348 Fed.Appx. at 699-700 (emphasis added).

The Non-Pratt Environment Evidence thus falls outside the broadest possible definition of Plaintiff Pratt's "environment" under the law.  Plaintiff Pratt's testimony establishes that when he was enrolled in the District, he ventured into other District school buildings on less than five occasions in his entire academic career.[22]  Thus, when Plaintiff Pratt was enrolled at the Theresa Primary School or the Evans Mills Primary School, his "environment" did not include the other primary schools, the Middle School, or the High School, which were physically separate (and geographically distant) buildings.  Similarly, when he was enrolled at the Middle School, his environment did not include the primary schools or the High School, and when he was enrolled at the High School, his environment did not include the primary schools or the Middle School.  Nor can Plaintiff argue that incidents of discrimination and harassment occurring prior to his enrollment were part of his environment in the District, when he never learned of them during his enrollment.  Far less can Plaintiff claim his environment in the District was impacted by alleged incidents of discrimination and harassment that occurred *after he withdrew from the District.*

The Non-Pratt Environment Evidence also is not relevant to show Defendants were on notice of Plaintiff Pratt's alleged hostile environment.  *See DT v. Somers Central School District,*

---

[22] Pratt Dep., p. 62.

11

*supra* (in Title IX suit, evidence regarding alleged incident of discrimination against another student in another school building did not show notice to school district of alleged harassment experienced by plaintiff).  In this respect, the "environment" is not composed of the High School's physical structure; a hostile environment does not persist as vibrations in the school walls.  The environment, for purposes of Plaintiff Pratt's claim, consists of *people* and how they conduct themselves.

Simply put, Plaintiff Pratt's environment consisted of different students than were involved in the Non-Pratt Environment Evidence incidents.  It must be remembered that, unlike a workplace, a four-year high school typically undergoes a nearly complete turnover of occupants every four years.[23]  Plaintiff Pratt likely never shared the High School in 2002 with any student involved in the alleged creation of a hostile environment in 1998 (or, for that matter, in 1994).[24]  Similarly, the staff and administrators at the schools changed over time, such that the superintendent and virtually all the principals changed between Plaintiff Pratt's enrollment and Plaintiff AEP's enrollment in the High School.[25]

Thus, even if the Non-Pratt Environment Evidence established the existence of a "hostile environment" at the High School in 1998 when Matthew Deem graduated, for example, the argument that Defendants were on notice of that environment does nothing to support Plaintiff Pratt's claim that Defendants were on notice of the nature of *his* environment.  The environment at the High School in 1998 was not connected to the environment at the High School when Plaintiff Pratt attended in 2002.  Further, the individuals involved and the conduct involved in forming the 1998 High School environment were necessarily distinct from the conduct of which

---

[23] Kettrick Aff., ¶ 5.

[24] *Id.,* ¶ 7.

[25] Kettrick Aff., ¶¶ 8-10.

Plaintiff Pratt complains. *See also Bliss v. Putnam Valley Central School District,* 2011 WL 1079944, *6 (S.D.N.Y. 2011) (if prior conduct was not "sufficiently similar" to conduct complained of, it did not put school administration on notice for purposes of Title IX liability).

Nor can Plaintiffs argue the Non-Pratt Environment Evidence is relevant to whether there was a "custom or policy" on the part of the District for purposes of Section 1983 liability. Those Section 1983 cases which have allowed discovery of "historical" violations to establish the existence of a custom or policy have been concerned with whether there were "acts or omissions of a municipality's supervisory officials serious enough to amount to gross negligence or deliberate indifference to the constitutional rights of the defendant." *See Villante v. Department of Corrections of the City of New York,* 786 F.2d 516, 519 (2d Cir. 1986). Even where liability is predicated on the existence of an inadequate training program, no less an authority than the Supreme Court has made clear that it is where decisionmakers know the program has "failed to prevent tortious conduct *by employees"* that deliberate indifference may be found. *Board of the County Commissions of Bryan County, Oklahoma v. Brown,* 20 U.S. 397, 407, 117 S.Ct. 1382, 1390 (1997); *see also Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 123 (2d Cir. 1991) (custom or policy could be shown by evidence of pattern of use of excessive force by police officers). The focus is on the actions of the municipality's officials, not third parties. The Non-Pratt Environment Evidence, however, concerns alleged actions of schoolchildren, which are not attributable to the Defendants under Plaintiff Pratt's claims.[26]

Finally, Plaintiffs cannot argue that the Non-Pratt Environment Evidence is relevant to the question of punitive damages. The claims for punitive damages – all of which are presented by Plaintiff Pratt – are made pursuant to 42 U.S.C. § 1983, as the procedural mechanism for

---

[26] Even if the Non-Pratt Environment Evidence was marginally relevant to establishing the existence of a "policy or custom" through deliberate indifference of the District's employees, it should be excluded based on its potential for extreme prejudice, confusion of the jury, and other related problems. See Point II, *infra.*

Plaintiff Pratt's claims under the Equal Access Act, the Equal Protection Clause, and the First Amendment.[27]   An award of punitive damages under Section 1983 requires a showing of intentional violation of the plaintiff's federal rights, or at least "reckless or callous disregard for *the plaintiff's* rights."  *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637 (1983) (emphasis added).  Just as a plaintiff cannot recover for harassment that was not part of his "environment," he cannot argue that a defendant acted in reckless disregard for his rights by ignoring harassment that was not part of his "environment."

For the foregoing reasons, the Non-Pratt Environment Evidence is not relevant to Plaintiff Pratt's claims of discrimination, harassment, and a hostile environment.

**B.     The Non-Pratt Environment Evidence is Not Relevant to Plaintiffs' Claims that Their Requests to Form a GSA were Improperly Denied.**

The Non-Pratt Environment Evidence is not relevant to Plaintiffs' claims that they were improperly refused the opportunity to form a GSA for several reasons.

First, such evidence is irrelevant to Plaintiff Pratt's claims concerning his requests to form a GSA at the High School, which were allegedly made to Defendant Kettrick during the 2002-2003 and 2003-2004 school years.[28]   Whether students (or even teachers) were engaging in discriminatory behavior in 1994 or 2007, or at the Middle School, has nothing to do with whether - or why – then-High School Principal Kettrick allegedly rejected these requests.  Even if some link could be drawn to Defendant Kettrick's own conduct in 1994 or 2007, that conduct would be inadmissible pursuant to Rule 404(b) of the Federal Rules of Evidence.

That leaves Plaintiff AEP's claims regarding alleged denial of her requests to form a GSA by Defendants Brown and Decker in 2009.  She asserts claims under the Equal Access Act

---

[27] See First Amended Complaint, Prayer for Relief ¶¶ 7 and 8.

[28] First Amended Complaint, ¶¶ 84, 92.

and the First Amendment's guarantees of freedom of speech and association.[29]  Plaintiff AEP

also presented a claim under New York Civil Rights Law § 40-c which states in part that "[b]y

this action, A.E.P. seeks to vindicate the public interest by preventing the School District, the

Board of Education, Mr. Kettrick, Mr. Decker, and Mr. Brown from denying any other School

District students the use of School District facilities based on sexual orientation and/or antigay

animus."[30]  The Section 40-c claim thus simply recasts Plaintiff AEP's claim regarding denial of

her requests to form a GSA as a state-law claim.

The Non-Pratt Environment Evidence does not pertain to any of the elements of Plaintiff

AEP's claims under these statutes and provisions.  Neither the Equal Access Act, nor the First

Amendment, nor Section 40-c afford Plaintiff AEP a cause of action to recover for the existence

of a hostile environment involving bias based on sexual orientation or gender nonconformity,

where it is not alleged that she is gay or perceived as gay or does not conform to gender

stereotypes.[31]  The Equal Access Act prohibits only the denial of equal access "on the basis of

the . . . content of the speech" of a proposed organization (20 U.S.C. § 4071(a)); the First

Amendment concerns, as relevant here, only speech and association rights; and Section 40-c

protects an individual from being subjected to discrimination "in *his or her* civil rights" based

on, e.g., sex or sexual orientation – not from witnessing discrimination against others (New York

Civil Rights Law § 40-c(2)).  *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197 (1975)

(prudential standing doctrine restricts individual to asserting own legal rights and interests unless

---

[29] First Amended Complaint, ¶¶ 145-152, 158-163.

[30] First Amended Complaint, ¶¶ 214-219.

[31] There has never been any allegation, evidence, or testimony that Plaintiff AEP is gay or was perceived as gay.  CCS Aff., ¶ 4.  Thus, Plaintiff AEP's claim under Section 40-c must be read as discrimination based on the content of her speech, since she has no claim under Section 40-c for discrimination solely experienced by others.

Congress has expressly, or by clear implication, granted standing to seek relief on basis of legal rights and interests of others).

Plaintiffs may argue that Non-Pratt Environment Evidence from around the time of Plaintiff AEP's requests in 2009 is relevant to show the Defendants Brown and Decker's motives in allegedly rejecting the requests. A brief consideration of the leaps in logic necessary to this theory should underscore its fallacy. It asks this Court to accept that if (1) a student called another student an antigay slur in 2009, and (2) a teacher heard it, and (3) the teacher failed to stop it, and (4) this happened because the District's policies against sexual orientation harassment were inadequately enforced by someone in District administration, this is (5) evidence that Defendants Decker and Brown were motivated by antigay bias when they allegedly rejected Plaintiff AEP's requests to form a GSA. The concatenated nature of this chain of reasoning – and the giant leap from the "inadequate enforcement" assumption to the inference regarding Defendants Decker and Brown's motives – does not furnish a sufficient connection to make the student-to-student incident relevant. *Cf. Swift v. Mauro,* 2008 WL 274906, *1 (N.D.N.Y. 2008) (with respect to civil complaints against city that contained allegations "wholly unrelated to those alleged in the [plaintiff's] complaint," their relevance was too tenuous to even allow discovery); *Armbruster v. Unisys Corp.,* 914 F.Supp. 1153 (E.D.Pa. 1996) (where individual not involved with allegedly discriminatory decision made comment purportedly expressing discriminatory company policy that would be furthered by decision, evidence of comment was too remote and connection to decision too attenuated to be admissible).

Alternatively, Plaintiffs may contend that the Non-Pratt Environment Evidence from circa 2009 is relevant to show the "need" for the GSA when Plaintiff AEP requested it. However, she is not seeking and cannot seek to recover for an alleged hostile environment at the

District; her claims rest on her rights of free speech and association, and to equal access to school facilities.  Those rights are not increased by the alleged existence of an environment at the District supposedly "necessitating" a GSA, any more than the existence of a tolerant atmosphere at the District would eliminate those rights.  Nothing in the Equal Access Act, the First Amendment, or Section 40-c makes the rights conferred therein contingent upon whether there is a need for the contemplated speech or organization.  Plaintiffs' rights to free speech, to associate, and to have equal access to school facilities thus exist regardless of whether the District has fostered a proper atmosphere regarding sexual orientation and related issues, and the Non-Pratt Environment Evidence – even that pertaining to alleged incidents in 2009 – can neither support nor undermine Plaintiff AEP's claims.[32]  Plaintiff AEP should not, under cover of a tenuous argument regarding Defendants Brown and Decker's intent, be allowed to effectively use these provisions to recover upon a "backdoor" hostile environment claim.

Nor is the Non-Pratt Environment Evidence from Plaintiff AEP's time at the High School (2007 to 2011) relevant simply because it allegedly formed the "context" or part of the "impetus" for Plaintiff AEP's requests.  There are many factors which may have formed part of the context of her requests, including the weather at the time, but that does not make such factors relevant.  In the end, furthermore, Plaintiff AEP's motivation in requesting to form a GSA is not material to the issues raised by her claim:  that the District impermissibly denied formation of a GSA because of the content of the proposed speech.

---

[32] Indeed, several of the leading cases in this area concern proposed student organizations addressing an issue which school districts are prohibited from regulating or promoting at all – religion.  *See, e.g., Good News Club v. Milford Central School,* 533 U.S. 98, 121 S.Ct. 2093 (2001) (leading "forum discrimination" case involving school district, which concerned club organized for religious discussion and practice).  Plainly, whether a school district has "properly" regulated student conduct in a particular area plays no role in reviewing its decisions regarding related student organizations under the Equal Access Act or the First Amendment (or, by extension, Section 40-c).

17

Therefore, the Non-Pratt Environment Evidence is not relevant to either Plaintiff Pratt's or Plaintiff AEP's claims regarding alleged denial of their requests to form a GSA at the High School.

## II.     THE NON-PRATT ENVIRONMENT EVIDENCE SHOULD NOT BE ADMITTED AT TRIAL BECAUSE OF ITS POTENTIAL FOR PREJUDICE, CONFUSION OF THE ISSUES, AND MISLEADING THE JURY

The Non-Pratt Environment Evidence's potential for prejudice to Defendants, confusion of the jury at trial, and inflaming the jury at trial outweighs any marginal relevance it may have.

Pursuant to Rule 403 of the Federal Rules of Evidence, relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." All of these considerations are implicated by the Non-Pratt Environment Evidence.

First, if the Non-Pratt Environment Evidence – that is, evidence of alleged discrimination and harassment occurring in a school in which Plaintiff Pratt was not even enrolled at the time – is admitted at trial, it will prejudice and confuse the jury. *See U.S. v. Massino,* 546 F.3d 123 (2d Cir. 2008) (testimony with little probative value – such as where it is not about individual charged with misconduct and does not address issues relating to his guilt – held inadmissible due to danger of unfair prejudice). If the Non-Pratt Environment Evidence is admitted along with incidents occurring during Plaintiff Pratt's attendance in a school building, it will be asking too much of the jury to keep straight, for every instance of alleged discrimination and harassment, when it occurred; where it occurred; and whether Plaintiff Pratt was enrolled at that building at that time. The various alleged incidents of the Non-Pratt Environment Evidence will be intermixed with evidence actually going toward the nature of Plaintiff Pratt's environment, and

the jury will inevitably – and incorrectly – take the Non-Pratt Environment Evidence into account when evaluating whether Plaintiff Pratt's environment was hostile.  *Cf. Swift v. Mauro, supra* (evidence of civil complaints against city that contained allegations "wholly unrelated to those alleged in the [plaintiff's] complaint" inadmissible due to potential prejudicial impact); *Armbruster, supra.*

The Non-Pratt Environment Evidence further will tend to inflame the jury, as any evidence of an alleged discriminatory or harassing act may be expected to do; but in the context of the Non-Pratt Environment Evidence, its inflammatory nature is unfair to Defendants, because as explained above it is not part of Plaintiff Pratt's claimed hostile environment.  *See U.S. v. Ravich,* 421 F.2d 1196 (2d Cir. 1970) (trial court has wide discretion to exclude relevant but inflammatory evidence); *U.S. v. Fawbush,* 900 F.2d 150 (8th Cir. 1990) (evidence that defendant sexually abused daughters, though relevant, was too inflammatory to admit in trial of his alleged sexual abse of two other children).

Furthermore, because Defendants are not strictly liable for a hostile environment created by student-on-student harassment, allowing introduction of the Non-Pratt Environment Evidence will also consume significant time with investigating whether each alleged act occurred, whether it was reported to the District, whether the District responded, whether the District's response demonstrated deliberate indifference to the existence of a hostile environment, and so forth – all for alleged incidents which Plaintiff Pratt, presumably, knew nothing about while he was enrolled at the District.  *See Blancha v. Raymark Industries,*  972 F.2d 507 (3d Cir. 1992) (evidence may be excluded when it would lead to litigation of "side issues" and distract jury).

If the Court does not now prohibit the introduction of the Non-Pratt Environment Evidence at trial, moreover, Defendants will experience immediate irrecoverable prejudice in the

discovery process.  As long as boundaries are not set on what is relevant to Plaintiff Pratt's

hostile environment claim at trial, Defendants are faced with an impossible task – seeking

discovery concerning schoolchildren attending the District over a period of decades.  Defendants

could conduct literally hundreds of interviews to determine who, if anyone, is likely to testify

that he or she experienced or witnessed discrimination at the District, and still leave a cast of

thousands from which Plaintiffs could cherrypick witnesses not interviewed by Defendants to

present at trial.  While exclusion of the Non-Pratt Environment Evidence will not eradicate this

hazard, it will provide a starting point for circumscribing the damage.

By contrast, there can be no real prejudice to Plaintiffs from the exclusion of the Non-

Pratt Environment Evidence.  Even if confined to evidence of acts of harassment or

discrimination that occurred within a school building while Plaintiff Pratt attended school there,

he will have the opportunity potentially to introduce evidence pertaining to the acts of at least

2,100 schoolchildren over a span of approximately twelve years (1993 to 2004).  In fact, he has

already alleged dozens of categories of discrimination directed at himself alone by upwards of

forty alleged harassing students.  If Plaintiff Pratt cannot paint a hostile environment using so

expansive a canvas, his claim is meritless.

Thus, the Non-Pratt Environment Evidence should be excluded from being introduced at

trial due to its potential for prejudice, inflaming the jury, confusion of the issues, and creation of

extensive collateral and irrelevant issues at trial.

### III.    THE NON-PRATT ENVIRONMENT EVIDENCE SHOULD BE EXCLUDED FROM DISCOVERY AS IRRELEVANT AND UNLIKELY TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, the scope of discovery

embraces information concerning non-privileged matters that are relevant and either admissible

at trial or reasonably calculated to lead to the discovery of admissible evidence.  For the reasons

set forth in Point I above, the Non-Pratt Environment Evidence is irrelevant and would not itself

be admissible at trial.  Further, it is not reasonably calculated to lead to the discovery of

admissible evidence.

Whether a student called another student an antigay slur in 2009 is obviously not likely to

lead to evidence relevant to Plaintiff Pratt's claims of a hostile environment in the early 2000s

and before, and is further not likely to lead to evidence regarding the motive behind the District's

alleged denial of permission to form a GSA.  Similarly, whether a high school student shoved

another student in the belief that the second student was gay in 1997 is unlikely to lead to

evidence pertaining to Plaintiff Pratt's experience at the High School in 2002, much less to

evidence pertaining to the alleged refusal to allow a GSA to be formed in 2009.  Pure speculation

that the Non-Pratt Environment Evidence may lead to admissible evidence is insufficient to

justify extending discovery to such matters.

Because the Non-Pratt Environment Evidence is neither itself relevant nor reasonably

likely to lead to the discovery of admissible evidence, it is outside the scope of proper discovery

under Rule 26.

## IV. A DETERMINATION OF THE ADMISSIBILITY OF THE NON-PRATT ENVIRONMENT EVIDENCE IS NEEDED NOW TO PREVENT PREJUDICE AND WASTE OF TIME

Although motions in limine are traditionally presented just prior to trial, in this case a

ruling on the admissibility of the Non-Pratt Environment Evidence now may protect Defendants

– and, in fact, Plaintiffs – from prejudice, unnecessary costs, and waste of time.

Whether the Non-Pratt Environment Evidence will be admitted at trial may profoundly

affect the course of discovery going forward.  Matthew Deem and Taunee Grant, the past

21

graduates of the District referenced in the First Amended Complaint, are good examples.  If there is no ruling now on the admissibility of evidence regarding alleged harassment and discrimination they suffered, Defendants must take their depositions to avoid surprise at trial. These would take up two of Defendants' limited allotment of depositions, and require the parties to travel to depose Mr. Deem in Pittsburgh, Pennsylvania and Ms. Grant in Washington, D.C. respectively, possibly only to find that all of their testimony ends up being ruled inadmissible at trial.  Similar considerations would attend alleged witnesses of discrimination and harassment following Plaintiff Pratt's withdrawal from the District.

Indeed, as noted above, absent some express limitation on what will be admissible at trial in the area of alleged incidents of discrimination and harassment, Defendants face a practically impossible task in discovery.  The limitations proposed herein would at least confine the pool of potential witnesses to some rational degree, even if they would not fully resolve the problem.

Thus, Defendants respectfully submit that a ruling on the admissibility of the Non-Pratt Environment Evidence now would be in the best interests of justice and judicial economy.[33]

---

[33] During the telephone conference with Judge Baxter, Plaintiffs' counsel argued Defendants had somehow waived their right to make the present motion because they did not timely raise objections to Plaintiffs' written discovery demands covering much of the Non-Pratt Environment Evidence.  Defendants dispute that the objections were not properly raised, but the matter is moot.  There is no statute, rule, or case to suggest that when a party fails to raise objections to a written discovery demand in a timely manner, that party is barred from raising objections to the relevance of information sought through *subsequent* discovery demands (such as the upcoming depositions in this matter).  Nor is there any statute, rule, or case suggesting that such a party would be barred from seeking to exclude that evidence at trial through a motion in limine.

## CONCLUSION

For all the foregoing reasons, and upon the above-cited authorities, Defendant Indian

River Central School District respectfully requests that its motion be granted.


Dated: April 24, 2012
     East Syracuse, New York                 Respectfully submitted,

                                            **The Law Firm of Frank W. Miller**

                                            **s/Charles C. Spagnoli, Esq.**
                                            Bar Roll No.:  507694
                                            *Attorneys for Defendants*
     *Indian River Central School District;*
     *Indian River Central School District*
     *Board of Education; James Kettrick,*
     *Superintendent of Indian River*
     *Central School District, in his*
     *official and individual capacities;*
     *Troy Decker, Principal of Indian*
     *River High School, in his official and*
     *individual capacities; and Jay*
     *Brown, John Davis, Kenda Gray,*
     *Amable Turner, Patricia Henderson,*
     *and Brian Moore, in their individual*
     *capacities*
     Office and Post Office Address:
     6575 Kirkville Road
     East Syracuse, New York  13057
     Telephone:  315-234-9900
     Facsimile:  315-234-9908
     cspagnoli@fwmillerlawfirm.com

23

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**CHARLES PATRICK PRATT and
A.E.P. through her parents and next friends
Bobbi Lynn Petranchuk and Todd Edward
Petranchuk,**

                Plaintiffs,

                                   **AFFIDAVIT OF JAMES
                                   KETTRICK SUPPORTING
                                   DEFENDANT'S MOTION IN
                                   LIMINE AND FOR
                                   PROTECTIVE ORDER**
                                   **Case No.: 7:09-cv-411 (GTS/TWD)**

      v.

**INDIAN RIVER CENTRAL SCHOOL
DISTRICT; INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central School
District, in his official and individual
Capacities; TROY DECKER, Principal of
Indian River High School, in his official and
Individual capacities; and JAY BROWN,
JOHN DAVIS, KENDA GRAY, AMABLE
TURNER, PATRICIA HENDERSON, and
BRIAN MOORE in their individual capacities,**

                Defendants.
_____

STATE OF NEW YORK    )
                         ) ss.:
COUNTY OF JEFFERSON  )

      JAMES KETTRICK, being duly sworn, deposes and says:

      1.      I am the superintendent of schools for Defendant Indian River Central School

District ("District"). I make this affidavit in support of the District's motion in limine and for a

protective order.

- 1 -

2. I make this affidavit of my own personal knowledge, except where matters are stated upon information and belief, and am fully competent to testify as to all matters herein with that qualification.

3. The average size of a freshman class year at the Indian River High School ("High School") is about two hundred and sixty (260) students. This is representative of the class size for a given grade at the Indian River Middle School ("Middle School"), and of the total class size for a given grade across all the primary schools in the District.

4. Due primarily to the fact that the District serves a large contingent of schoolchildren of military personnel at Fort Drum, there is a significant amount of turnover between freshman and senior years at the High School. As military personnel are reassigned or move away, older children are removed from the District. Because Fort Drum skews toward younger recruits, the average age of incoming new students is lower than the average age of outgoing existing students. The net effect is that, of the approximately two hundred and sixty beginning freshman in a given class year, roughly two hundred (200) will graduate as seniors from the High School, and they will graduate in a class of less than two hundred and sixty students, with the difference representing students who have entered and left the District since the beginning of freshman year.

5. The High School is and at all times relevant to this litigation was a four-year school covering grades nine through twelve. As is typical of most four-year schools, the students at the High School in a given school year will, with rare exceptions, have left the High School after four years.

6. The Middle School was a four-year school, covering grades five through eight, during the period when Plaintiff Pratt attended it. Since that time the Indian River Intermediate

- 2 -

School ("Intermediate School") was opened to cover grades four and five, at which time the Middle School became a three-year school covering grades six through eight. As with the High School, with rare exceptions, the students who attended the Middle School during a given school year would have left the Middle School after four years.

7.      Thus, for example, in the 1997-1998 school year, approximately 850 students attended the High School in the freshman through senior grades. By the beginning of the 2001-2002 school year, almost none of those 850 students would still have been enrolled at the High School; it would have been populated almost entirely by roughly 850 different students.

8.      In addition to the regular turnover of students, the employees of the District have, of course, changed substantially over the years. For example, I am presently the superintendent of schools, and have held that position since July, 2006. Defendant Troy Decker is the High School principal, and has held that position since June, 2006. Cory Wood is the High School Assistant Principal, and has held that position since 2009. Defendant Jay Brown is the High School Athletic Director, and has held that position since roughly the beginning of the 2009-2010 school year. Nancy Taylor-Schmidt is the Middle School principal, and has held that position since 2006. Lana Taylor is the Intermediate School principal, and has held that position since 2002. Defendant Brian Moore is the Intermediate School assistant principal, and has held that position since July, 2010.

9.      As indicated above, almost all of these positions were staffed by different personnel at the time Plaintiff Pratt attended school in the District. Thus, Roger Adams was the superintendent of schools at that time, not me. I was the High School principal from 1993 to July, 2006, or throughout Plaintiff Pratt's enrollment, instead of Mr. Decker. Defendant John Davis was the High School assistant principal, not Mr. Wood. Someone other than Mr. Brown

- 3 -

was the High School athletic director.  Someone other than Nancy Taylor-Schmidt was the

Middle School principal.  Someone other than Lana Taylor was the Intermediate School

principal from the time it opened until 2002.

10.    The teaching staff and other employees of the District have also undergone

normal turnover from year to year, including from the time Plaintiff Pratt ceased attending the

District until today.

_____
JAMES KETTRICK

Sworn to before me this 17th
day of April, 2012.

_____
Notary public

JENNIFER L. WHITNEY
Notary Public, State of New York
No. 01WH5018823
Qualified in Jefferson County
My Commission Expires October 12, 2013

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES PATRICK PRATT and
A.E.P. through her parents and next friends
Bobbi Lynn Petranchuk and Todd Edward
Petranchuk,

                    Plaintiffs,

**AFFIDAVIT OF CHARLES C.
SPAGNOLI SUPPORTING
DEFENDANT'S MOTION IN
LIMINE AND FOR
PROTECTIVE ORDER**
Case No.: 7:09-cv-411 (GTS/TWD)

    v.

INDIAN RIVER CENTRAL SCHOOL
DISTRICT; INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central School
District, in his official and individual
Capacities; TROY DECKER, Principal of
Indian River High School, in his official and
Individual capacities; and JAY BROWN,
JOHN DAVIS, KENDA GRAY, AMABLE
TURNER, PATRICIA HENDERSON, and
BRIAN MOORE in their individual capacities,

                    Defendants.

---

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF ONONDAGA )

       CHARLES C. SPAGNOLI, being duly sworn, deposes and says:

       1.     I am an attorney duly licensed to practice law in the State of New York and

admitted to practice before this Court.  I represent the Defendants in the above-captioned

litigation. I make this affidavit in support of the motion by Defendant Indian River Central School District ("District") in limine and for a protective order.

2.      I make this affidavit of my own personal knowledge, except where matters are stated upon information and belief, and am fully competent to testify as to all matters herein with that qualification.

3.      Plaintiff Charles Pratt was born in 1988 and attended schools in the District from 1993 to October, 2004. He has presented claims in this litigation alleging (1) that he experienced harassment based on sexual orientation and gender stereotyping during his attendance in the District to which the District did not adequately respond and (2) that he requested, and was denied, permission to form a gay-straight alliance ("GSA") at the Indian River High School ("High School"), in violation of his rights.\

4.      Plaintiff Ashley Petranchuk ("AEP") attended schools in the District from 2000 to June, 2011, and in particular attended the High School from 2007 to 2011. She never attended a school building simultaneously with Plaintiff Pratt. She has presented claims in this litigation alleging that she requested, and was denied, permission to form a GSA at the High School in violation of her rights. Specifically, she claims that in two conversations – one with Defendant Jay Brown, and one with Defendant Troy Decker – she was denied the opportunity to start a GSA. (There has never been any allegation, testimony, or evidence that Plaintiff AEP was gay, perceived as gay, or perceived as acting in a non-gender-conforming manner, or that she suffered discrimination or harassment for any of those reasons.)

5.      Plaintiffs served broad written interrogatories and production requests, demanding information relating to student disciplinary matters within the District going back to 1990. Copies of Plaintiffs' interrogatories and production requests are attached as Exhibits A, B, and C.

6.      In response to Plaintiffs' written discovery demands, Defendants produced approximately 8,500 pages of documents and substantial information which had no apparent relation to Plaintiffs' claims, at great cost to the District in terms of attorney's fees and District personnel resources.

7.      In response to written interrogatories posed by Defendant Indian River Central School District Board of Education ("Board"), Plaintiff Pratt set forth dozens of allegations of student-on-student harassment, covering the entire period of his attendance at schools in the District from 1993 to October, 2004.

8.      Defendants took the deposition of Plaintiff Pratt on February 10, 2012, and continued and concluded such deposition on March 9, 2012.  Pages from the transcript of Plaintiff Pratt's deposition which are pertinent to the instant motion are attached as Exhibit D.

9.      Defendants took the deposition of Plaintiff AEP on February 7, 2012.  Pages from the transcript of Plaintiff AEP's deposition which are pertinent to the instant motion are attached as Exhibit E.

10.      Plaintiffs took the deposition of  Defendant James Kettrick on March 15, 2012. During the deposition, Plaintiffs' counsel asked extensive questions regarding alleged student-on-student discrimination and harassment during Defendant Kettrick's entire tenure as principal of the High School, which began in 1993 – approximately nine years before Plaintiff Pratt entered the High School.  Pages from the transcript of Defendant Kettrick's deposition which are pertinent to the instant motion are attached as Exhibit F.

11.      Plaintiffs took the deposition of Defendant Jay Brown on March 22, 2012. During the depostion, Plaintiffs' counsel asked extensive questions regarding incidents of alleged student-on-student discrimination and harassment during Defendant Brown's tenure as assistant

principal of the High School (which was from Fall, 2006 to Spring, 2009). Plaintiffs' counsel

further questioned Defendant Brown about incidents of alleged discrimination during Defendant

Brown's entire period of employment with the District – a span of some twenty-eight years

going back to 1984. Pages from the transcript of Defendant Brown's deposition which are

pertinent to the instant motion are attached as Exhibit G.

   12.  Defendants' counsel objected to such questioning and attempted to convene a

conference call with the Court. Unfortunately, neither the Hon. Therese Wiley Dancks nor the

Hon. Glenn T. Suddaby was available, and the parties instead were afforded the opportunity to

discuss the issue with the Hon. Andrew Baxter. Judge Baxter limited his ruling to the deposition

of Defendant Brown and said that Plaintiffs' counsel could ask the questions at issue, but subject

to Defendants' objections as to relevance. He further said the parties could revisit the issue with

the regularly-assigned magistrate and/or judge on the case.

   13.  During a telephone conference with Plaintiffs' counsel held April 10, 2012,

Defendants' counsel reiterated his position that alleged incidents of harassment or discrimination

occurring before or after Plaintiff Pratt's attendance in the District, or occurring in a building at

which Plaintiff Pratt did not attend school, were irrelevant to Plaintiffs' claims, and discovery

seeking evidence of such incidents was not reasonably calculated to lead to the discovery of

admissible evidence. Plaintiffs' counsel disagreed, holding – as Plaintiffs' counsel had

contended in the conference call with Judge Baxter – that evidence respecting harassment and

discrimination during Plaintiff AEP's time at the High School and that evidence respecting

harassment and discrimination during the attendance of Matthew Deem and Taunee Grant at the

High School (prior to Plaintiff Pratt's attendance at the High School) were relevant and

discoverable.  Despite this good-faith effort to explore an informal resolution, the issues raised

by this motion could not be resolved between the parties.

14.     Immediately following the April 10 conference among counsel, the parties

convened a telephone conference with the Hon. Therese Wiley Dancks.  Judge Dancks approved

Defendants' request for leave to file the instant motion with the Hon. Glenn T. Suddaby in light

of the fact that the motion seeks, inter alia, a ruling concerning the admissibility of certain

evidence at trial.

15.     Absent a prompt determination regarding the admissibility and discoverability of

evidence of incidents of discrimination or harassment occurring in a school building when

Plaintiff Pratt was not attending school in such building (the "Non-Pratt Environment

Evidence"), Defendants will be severely prejudiced and forced to bear substantial unnecessary

costs.  As argued in the accompanying memorandum of law, the Non-Pratt Environment

Evidence is not relevant to any of Plaintiffs' claims, it would be unfairly prejudicial at trial, and

it is not reasonably calculated to lead to the discovery of admissible evidence.  If the Non-Pratt

Environment Evidence is excluded from the scope of discovery, certain depositions can be

avoided that otherwise would have to be conducted (particularly those of Matthew Deem and

Taunee Grant, who upon information and belief live in Pittsburgh, Pennsylvania and

Washington, D.C. respectively, but likely others as well).  Further, various areas of questioning

could be eliminated or significantly narrowed in the course of depositions.  Finally, prejudice to

the Defendants in the discovery process (discussed in the District's accompanying memorandum

of law) would be prevented.

16.     The District therefore respectfully submits that a ruling on the admissibility and discoverability of the Non-Pratt Environment Evidence now would be in the best interests of justice and judicial economy.

17.     In view of the importance of these issues to the litigation and the complexity of the arguments, the District respectfully submits that oral argument would be helpful to the Court, and also requests leave to submit a reply by June 15, 2012.  An earlier date for reply would present significant difficulties to Defendants' counsel as he will be out of the state, and likely out of the range of telecommunications, from May 31 to June 11, 2012.

CHARLES C. SPAGNOLI

Sworn to before me this 24th
day of April, 2012.

Notary public

PATRICIA GUERIN
Notary Public, State of New York
Qual. in Onondaga Co. No. 01GU6065911
Commission Expires October 29, 2013

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES PATRICK PRATT and
A.E.P. through her parents and next friends
Bobbi Lynn Petranchuk and Todd Edward
Petranchuk,

               Plaintiffs,

    - vs. -

INDIAN RIVER CENTRAL SCHOOL
DISTRICT; INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central School
District, in his official and individual
capacities; TROY DECKER, Principal of
Indian River High School, in his official and
individual capacities; and JAY BROWN,
JOHN DAVIS, KENDA GRAY, AMABLE
TURNER, PATRICIA HENDERSON, and
BRIAN MOORE, in their individual
capacities,

               Defendants.

               7:09-cv-411 (GTS/GHL)
               ECF Case

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO THE INDIVIDUAL DEFENDANTS

Pursuant to Federal Rule of Civil Procedure 33, the attorneys for the above-captioned Plaintiffs hereby request that James Kettrick, Troy Decker, Jay Brown, John Davis, Kendra Gray, Amable Turner, Patricia Henderson, and Brian Moore (collectively, the "Individual Defendants"), respond to these Interrogatories within 30 days of their date of service.

## DEFINITIONS

1.     "Plaintiffs" refers to Charles Pratt and A.E.P.

2.     "Individual Defendants" refers to James Kettrick, Troy Decker, Jay Brown, John Davis, Kendra Gray, Amable Turner, Patricia Henderson, and Brian Moore.

3.      "Institutional Defendants" refers to the District and the Board.

4.      "Defendants" refers to the Individual Defendants and Institutional Defendants collectively.

5.      The terms "You" and "Your" refer to the Individual Defendants.

6.      "High School" means Indian River High School.

7.      "Middle School" means the Indian River Middle School.

8.      "District" refers to Indian River Central School District and any and all current or former officials, administrators, representatives, consultants, special assistants, agents, consultants, experts, investigators, officers, directors, employees, attorneys, and any and all of its agencies, divisions, subdivisions, departments, schools, and associated schools under its jurisdiction.

9.      "Board" refers to the Indian River School District Board Of Education and any and all current or former officials, administrators, representatives, consultants, special assistants, agents, consultants, experts, investigators, officers, directors, employees, attorneys, and any and all of its agencies, divisions, subdivisions, departments, schools, and associated schools who are authorized to set or enforce policy or to punish students.

10.     "Policies and Procedures" refers to any law, policy, procedure, regulation, order, rule, pronouncement, publication, educational material or event, whether oral, written, or electronic.

11.     "Complaint," when capitalized, means the First Amended Complaint.

12.     "Identify," when referring to a person, means to give the person's full name, present or last known address, and, when referring to a natural person, the present or last know place of employment.

13.     "Communication" and its plural shall mean any transmittal of information, whether oral or written, including correspondence, electronic mail ("e-mail"), telexes, facsimile transmissions, telecopies, recordings in any medium of oral communication, telephone and message logs, and notes or memoranda relating to any written or oral communication.

14. "<u>Document</u>" shall be construed in its most inclusive meaning, including without limitation all of the things meeting the definition of "documents" set forth in Rule 34(a) of the Federal Rules of Civil Procedure and the definitions of "writings" and "recordings" set forth in Rule 1001 of the Federal Rules of Evidence.

15. "<u>Reflecting</u>," "<u>regarding</u>," "<u>concerning</u>," "<u>referring</u>," "<u>related</u>," "<u>relating to</u>," or "<u>evidencing</u>" shall mean constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, mentioning, concerning, and/or referring to, directly or indirectly.

## <u>INSTRUCTIONS</u>

The following instructions apply to each of the Interrogatories herein, and are deemed to be incorporated in each of them:

16. A response to each Interrogatory is to be made within 30 days after the date of service of the Interrogatory.

17. Should You fail to answer any Interrogatory, You are requested to provide an explanation for the reason, if any, that no answer is given.

18. A response to these Interrogatories may be made by the production of documents only if the burden of deriving or ascertaining the answer to the Interrogatory would be substantially the same for You as for Plaintiffs, and in that case the Bates range of responsive documents should be specified to the extent practicable.

19. For purposes of reading, interpreting or construing the scope of these Interrogatories, the terms used shall be in there most expansive and inclusive interpretation. This includes: (a) "any," "all," "each," or "every" shall mean "any, all, each and every"; (b) "and" or "or" shall mean "and/or"; and (c) "including" shall mean "including but not limited to." The use of a verb in any particular tense shall be construed as the use of the verb in all other tenses whenever necessary to bring within the scope of an interrogatory information that You might otherwise construe to be outside its scope.

3

Case 7:09-cv-00411-GTS-TWD   Document 126-3   Filed 04/24/22   Page 48 of 99

20.     These Interrogatories are continuing, and You shall amend Your responses, as necessary, upon discovery of information that alters or affects Your responses.

21.     The relevant time period for the Interrogatories, unless specifically noted otherwise, is September 1, 1990 until the date of the response or amendments to the Interrogatories.

# INTERROGATORIES

## INTERROGATORY NO. 1.

Identify all the people who prepared or assisted in the preparation of the responses to these Interrogatories.

## INTERROGATORY NO. 2.

Identify all persons who have knowledge of any fact relevant to the claims and defenses in this action, and state each subject matter of which each such person has knowledge.

## INTERROGATORY NO. 3.

Describe any and all professional training You have received regarding (including training on identifying, addressing and reporting) harassment, discrimination, bullying, and/or bias, including but not limited to on the basis of sex (including nonconformity with sex stereotypes), gender, sexual orientation, race, national origin, ethnicity, or religion including the date, length, and provider of such training.

## INTERROGATORY NO. 4.

Specify each public statement made by You during the relevant time period concerning gay, lesbian, bisexual, transgender, or gender non-conforming individuals or addressing antigay or sexist discrimination or harassment.

## INTERROGATORY NO. 5.

Describe each incident or report that You became aware of involving harassment, discrimination, bias, abuse, vandalism, or hostility, including on the basis of sexual orientation, race, national origin, ethnicity, religion, or sex (including perceived nonconformity with sex stereotypes) at schools within the District, whether by personal observation, complaint, report, or otherwise, including the persons involved, the date and manner by which You became aware, and Your response, if any, including any communications by You to any other person and any discipline imposed or other corrective action taken.

## INTERROGATORY NO. 6.

Specify each public statement made by any Defendant during the relevant time period concerning gay, lesbian, bisexual, transgender, or gender non-conforming individuals or addressing antigay or sexist discrimination or harassment.

## INTERROGATORY NO. 7.

Specify all steps that You took to preserve documents relating to the allegations in the Complaint, including the steps You took to preserve electronically created and/or stored documents.

**INTERROGATORY NO. 8.**

Describe each communication You have had with any person, including the Plaintiffs, concerning the possibility, proposal of, or formation of a gay-straight alliance at the High School, including when and with whom the communications occurred.

**INTERROGATORY NO. 9.**

Describe each incident or report that You became aware of involving public displays of affection, including kissing, between students at schools within the District, whether by personal observation, complaint, report, or otherwise, including the persons involved, the date and manner by which You became aware, and Your response, if any, including any communications by You to any other person and any discipline imposed or other corrective measures taken.

Dated:    May 31, 2011
          New York, NY


  s/ Thomas W. Ude, Jr.
_____

Thomas W. Ude, Jr., Bar Number 515867     Vickie Reznik
Hayley Gorenberg, Bar Number 515453     Adam T. Humann
          Maura M. Klugman
          Alexandra P. Kolod


*Attorneys For Plaintiffs*                *Attorneys for Plaintiffs*

LAMBDA LEGAL DEFENSE AND      KIRKLAND & ELLIS LLP
EDUCATION FUND, INC.           601 Lexington Avenue
120 Wall Street, Suite 1500        New York, NY 10022-4611
New York, NY 10005-3904          Telephone:  (212) 446 - 4800
Telephone:  (212) 809 - 8585       Facsimile:  (212) 446 - 4900
Facsimile:  (212) 809 - 0055        E-mail:  vickie.reznik@kirkland.com
E-mail:  tude@lambdalegal.org      E-mail:  adam.humann@kirkland.com
E-mail:  hgorenberg@lambdalegal.org  E-mail:  maura.klugman@kirkland.com
          E-mail:  alexandra.kolod@kirkland.com

**EXHIBIT B**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES PATRICK PRATT and
A.E.P. through her parents and next friends
Bobbi Lynn Petranchuk and Todd Edward
Petranchuk,

                    Plaintiffs,

    - vs. -

INDIAN RIVER CENTRAL SCHOOL
DISTRICT; INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central School
District, in his official and individual
capacities; TROY DECKER, Principal of
Indian River High School, in his official and
individual capacities; and JAY BROWN,
JOHN DAVIS, KENDA GRAY, AMABLE
TURNER, PATRICIA HENDERSON, and
BRIAN MOORE, in their individual
capacities,

                    Defendants.

7:09-cv-411 (GTS/GHL)
ECF Case

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO THE INSTITUTIONAL DEFENDANTS

        Pursuant to Federal Rule of Civil Procedure 33, the attorneys for the above-captioned Plaintiffs hereby request that Indian River Central School District and the Indian River Central School District Board Of Education (collectively, the "Institutional Defendants"), respond to these Interrogatories within 30 days of their date of service.

## DEFINITIONS

    1.      "Plaintiffs" refers to Charles Pratt and A.E.P.

    2.      "Individual Defendants" refers to James Kettrick, Troy Decker, Jay Brown, John Davis, Kendra Gray, Amable Turner, Patricia Henderson, and Brian Moore.

3.      "<u>Institutional Defendants</u>" refers to the District and the Board.

4.      "<u>Defendants</u>" refers to the Individual Defendants and Institutional Defendants collectively.

5.      The terms "<u>You</u>" and "<u>Your</u>" refer to the Defendants.

6.      "<u>High School</u>" means Indian River High School.

7.      "<u>Middle School</u>" means Indian River Middle School.

8.      "<u>District</u>" refers to Indian River Central School District and any and all current or former officials, administrators, representatives, consultants, special assistants, agents, consultants, experts, investigators, officers, directors, employees, attorneys, and any and all of its agencies, divisions, subdivisions, departments, schools, and associated schools under its jurisdiction.

9.      "<u>Board</u>" refers to the Indian River School District Board Of Education and any and all current or former officials, administrators, representatives, consultants, special assistants, agents, consultants, experts, investigators, officers, directors, employees, attorneys, and any and all of its agencies, divisions, subdivisions, departments, schools, and associated schools who are authorized to set or enforce policy or to punish students.

10.      "<u>Policies and Procedures</u>" refers to any law, policy, procedure, regulation, order, rule, pronouncement, publication, educational material or event, whether oral, written, or electronic.

11.      "<u>Complaint,</u>" when capitalized, means the First Amended Complaint.

12.      "<u>Identify</u>," when referring to a person, means to give the person's full name, present or last known address, and, when referring to a natural person, the present or last know place of employment.

13.      "<u>Communication</u>" and its plural shall mean any transmittal of information, whether oral or written, including correspondence, electronic mail ("e-mail"), telexes, facsimile transmissions, telecopies, recordings in any medium of oral communication, telephone and message logs, and notes or memoranda relating to any written or oral communication.

14.     "<u>Document</u>" shall be construed in its most inclusive meaning, including without limitation all of the things meeting the definition of "documents" set forth in Rule 34(a) of the Federal Rules of Civil Procedure and the definitions of "writings" and "recordings" set forth in Rule 1001 of the Federal Rules of Evidence.

15.     "<u>Reflecting</u>," "<u>regarding</u>," "<u>concerning</u>," "<u>referring</u>," "<u>related</u>," "<u>relating to</u>," or "<u>evidencing</u>" shall mean constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, mentioning, concerning, and/or referring to, directly or indirectly.

## INSTRUCTIONS

The following instructions apply to each of the Interrogatories herein, and are deemed to be incorporated in each of them:

16.     A response to each Interrogatory is to be made within 30 days after the date of service of the Interrogatory.

17.     Should You fail to answer any Interrogatory, You are requested to provide an explanation for the reason, if any, that no answer is given.

18.     A response to these Interrogatories may be made by the production of documents only if the burden of deriving or ascertaining the answer to the Interrogatory would be substantially the same for You as for Plaintiffs, and in that case the Bates range of responsive documents should be specified to the extent practicable.

19.     For purposes of reading, interpreting or construing the scope of these Interrogatories, the terms used shall be in there most expansive and inclusive interpretation.  This includes:  (a) "any," "all," "each," or "every" shall mean "any, all, each and every"; (b) "and" or "or" shall mean "and/or"; and (c) "including" shall mean "including but not limited to."  The use of a verb in any particular tense shall be construed as the use of the verb in all other tenses whenever necessary to bring within the scope of an interrogatory information that You might otherwise construe to be outside its scope.

20.     These Interrogatories are continuing, and You shall amend Your responses, as necessary, upon discovery of information that alters or affects Your responses.

21.     The relevant time period for the Interrogatories, unless specifically noted otherwise, is September 1, 1990 until the date of the response or amendments to the Interrogatories.

## INTERROGATORIES

**INTERROGATORY NO. 1.**
Identify all persons who prepared or assisted in the preparation of the responses to these Interrogatories.

**INTERROGATORY NO. 2.**
Identify all persons who have knowledge of the facts relevant to the claims and defenses in this action, and state the subject matters of which each such person has knowledge.

**INTERROGATORY NO. 3.**
Identify each and every formal or informal complaint or report of harassment or bullying made by or on behalf of any student in the District, including the Plaintiffs to You.

**INTERROGATORY NO. 4.**
Set forth the names, addresses, dates of service, and respective positions of all counselors at the Middle School and at the High School from September 1998 until the present, including, but not limited to, guidance and academic counselors.

**INTERROGATORY NO. 5.**
Set forth the names, addresses, dates of service, and respective positions of all members of the Board from September 1990 to the present.

**INTERROGATORY NO. 6.**
Identify all personnel employed by You who are responsible, in whole or in part, for developing and/or implementing Policies and Procedures meant to address harassment and discrimination in school within the District, including, but not limited to, those who are responsible for developing and/or implementing Policies and Procedures meant to address harassment, discrimination, bias, abuse, vandalism, or hostility toward students or toward any particular individual student in the District, including on the basis of sexual orientation, race, national origin, ethnicity, religion, or sex (including perceived nonconformity with sex stereotypes) at schools within the District.

**INTERROGATORY NO. 7.**
Identify all personnel who were or are responsible for, in whole or in part, responding to or investigating reports of issues of harassment, discrimination, bias, abuse, vandalism, or hostility toward students or toward any individual student at schools in the District, and with respect to each, state when he or she held such responsibility.

5

**INTERROGATORY NO. 8.**
Describe any professional training or other instruction You have provided or made available to teachers, staff, and/or students at the Middle School and at the High School regarding harassment, discrimination, bullying, bias, abuse, vandalism, or hostility on any basis, including but not limited to on the basis of sexual orientation, race, national origin, ethnicity, religion or sex (including perceived nonconformity with sex stereotypes) at schools within the District, including the date, length, all materials provided, and who was in attendance.

**INTERROGATORY NO. 9.**
Describe each incident that You became aware of involving harassment, discrimination, bullying, bias, or hostility, including but not limited to on the basis of sexual orientation, race, national origin, ethnicity, religion or sex (including nonconformity with sex stereotypes) at schools within the District, including the date and manner of each incident or complaint of which You became aware.

**INTERROGATORY NO. 10.**
Describe in detail the complaint and investigation procedures that were applied to complaints of harassment, threats, bullying, vandalism, abuse, or hostility on any basis, whether directed at students or at a particular student, including but not limited to on the basis of sexual orientation, race, national origin, ethnicity, religion, or sex (including perceived nonconformity with sex stereotypes) at schools within the District, including any formal Middle School, High School or District Policies or Procedures that were or should have been followed.

**INTERROGATORY NO. 11.**
Specify every action taken by You from September 1, 1990 to the present in response to or otherwise addressing harassment, bias, vandalism, abuse, bullying, or hostility toward students based on any characteristic, including but not limited to on the basis of sexual orientation, race, national origin, ethnicity, religion, or sex (including perceived nonconformity with sex stereotypes) at schools within the District, including the types of incidents alleged in the Complaint.

**INTERROGATORY NO. 12.**
Specify each public statement made by You during the relevant time period concerning gay, lesbian, bisexual, transgender, or gender non-conforming students or concerning antigay or sexist discrimination or harassment.

**INTERROGATORY NO. 13.**
Describe in detail all inquiries, conversations, or requests, including those alleged in the Amended Complaint, concerning the proposal, formation, or operation of student groups or organizations, including but not limited to a gay-straight alliance, at the High School, including

6

the persons making the inquiry or request, whether such a group or organization was formed, and the basis for granting or denying formation.

**INTERROGATORY NO. 14.**
Identify each faculty member at the Middle School from September 1999 through June 2002, and at the High School during the Relevant Time, including name, e-mail address, a brief job description including duties, subjects taught, and, if any, club/activity affiliation.

**INTERROGATORY NO. 15.**
Identify each non-curricular student club, organization, and/or activity at the High School since 2002, including non-curricular student clubs, organizations, and/or activities that are no longer in existence, and the advisor for each, including each advisor's position, if any, with the High School or the District.

**INTERROGATORY NO. 16.**
Identify each and every person with whom any investigator employed by the Institutional Defendants or their attorneys had contact for purposes of this litigation.

**INTERROGATORY NO. 17.**
Specify all steps that You took to preserve documents relating to the allegations in the Complaint, including the steps You took to preserve electronically created and/or stored documents.

Dated:  May 31, 2011
        New York, NY


   s/ Thomas W. Ude, Jr.

Thomas W. Ude, Jr., Bar Number 515867          Vickie Reznik
Hayley Gorenberg, Bar Number 515453            Adam T. Humann
                                               Maura M. Klugman
                                               Alexandra P. Kolod


*Attorneys For Plaintiffs*                     *Attorneys for Plaintiffs*

LAMBDA LEGAL DEFENSE AND                       KIRKLAND & ELLIS LLP
EDUCATION FUND, INC.                           601 Lexington Avenue
120 Wall Street, Suite 1500                    New York, NY 10022-4611
New York, NY 10005-3904                        Telephone:  (212) 446 - 4800
Telephone:  (212) 809 - 8585                   Facsimile:  (212) 446 - 4900
Facsimile:  (212) 809 - 0055                   E-mail:  vickie.reznik@kirkland.com
E-mail:  tude@lambdalegal.org                  E-mail:  adam.humann@kirkland.com
E-mail:  hgorenberg@lambdalegal.org            E-mail:  maura.klugman@kirkland.com
                                               E-mail:  alexandra.kolod@kirkland.com

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES PATRICK PRATT and
A.E.P. through her parents and next friends
Bobbi Lynn Petranchuk and Todd Edward
Petranchuk,

               Plaintiffs,

    - vs. -

INDIAN RIVER CENTRAL SCHOOL
DISTRICT; INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central School
District, in his official and individual
capacities; TROY DECKER, Principal of
Indian River High School, in his official and
individual capacities; and JAY BROWN,
JOHN DAVIS, KENDRA GRAY, AMABLE
TURNER, PATRICIA HENDERSON, and
BRIAN MOORE, in their individual
capacities,

               Defendants.

7:09-cv-411 (GTS/GHL)
ECF Case

---

## PLAINTIFFS' FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS

        Pursuant to Federal Rule of Civil Procedure 34, the attorneys for the above-captioned Plaintiffs hereby request that Indian River Central School District, Indian River Central School District Board of Education, James Kettrick, Troy Decker, Jay Brown, John Davis, Kendra Gray, Amable Turner, Patricia Henderson, and Brian Moore (collectively, the "Defendants") respond to these Requests for Production within 30 days of their date of service.

## DEFINITIONS

1.      "Plaintiffs" refers to Charles Pratt and A.E.P.

2.      "Institutional Defendants" refers to the District, the Board, and James Kettrick and Troy Decker, in their official capacities.

3.    "<u>Individual Defendants</u>" refers to James Kettrick in his individual capacity, Troy Decker in his individual capacity, Jay Brown, John Davis, Kendra Gray, Amable Turner, Patricia Henderson, and Brian Moore.

4.    "<u>Defendants</u>" refers to the Individual Defendants and Institutional Defendants collectively.

5.    The terms "<u>You</u>" and "<u>Your</u>" refer to the Defendants.

6.    "<u>High School</u>" means Indian River High School.

7.    "<u>Middle School</u>" means the Indian River Middle School.

8.    "<u>District</u>" refers to Indian River Central School District and any and all current or former officials, administrators, representatives, consultants, special assistants, agents, consultants, experts, investigators, officers, directors, employees, attorneys, and any and all of its agencies, divisions, subdivisions, departments, schools, and associated schools under its jurisdiction.

9.    "<u>Board</u>" refers to the Indian River School District Board Of Education and any and all current or former officials, administrators, representatives, consultants, special assistants, agents, consultants, experts, investigators, officers, directors, employees, attorneys, and any and all of its agencies, divisions, subdivisions, departments, schools, and associated schools who are authorized to set or enforce policy or to punish students.

10.    "<u>Policies and Procedures</u>" refers to any law, policy, procedure, regulation, order, rule, pronouncement, publication, educational material or event, whether oral, written, or electronic.

11.    "<u>Complaint,</u>" when capitalized, means the First Amended Complaint.

12.    "<u>Communication</u>" and its plural shall mean any transmittal of information, whether oral or written, including but not limited to correspondence, electronic mail ("e-mail"), telexes, facsimile transmissions, telecopies, recordings in any medium of oral communication, telephone and message logs, and notes or memoranda relating to any written, electronic or oral communication.

13.     "<u>Document</u>" shall be construed in its most inclusive meaning, including without limitation all of the things meeting the definition of "documents" set forth in Rule 34(a) of the Federal Rules of Civil Procedure and the definitions of "writings" and "recordings" set forth in Rule 1001 of the Federal Rules of Evidence.

14.     "<u>Reflecting</u>," "<u>regarding</u>," "<u>concerning</u>," "<u>referring</u>," "<u>related</u>," "<u>relating to</u>," or "<u>evidencing</u>" shall mean constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, mentioning, concerning, and/or referring to, directly or indirectly.

## <u>INSTRUCTIONS</u>

The following instructions apply to each of the Requests for Production herein, and are deemed to be incorporated in each of them:

15.     You are requested to produce all documents described below, which are in Your possession, custody, or control.

16.     Production shall be made by July 1, 2011, at the New York offices of Kirkland & Ellis LLP.

17.     Unless otherwise specified, the time period to which this document Request refers is September 1, 1990 to the present day.  If any document is undated and the date of its preparation cannot be determined, the document shall be produced if it is otherwise responsive to this Request.

18.     If You assert a timely objection to any portion of a request, definition, or instruction, provide a response as to the remaining portion.

19.     Pursuant to FRCP Rule 34(b), the documents produced shall be produced (a) as they are kept in the usual course of business or (b) shall be organized and labeled to correspond to the paragraph of this Request to which they are responsive.  If a document is responsive to more than one paragraph of this Request, it shall be labeled to correspond to the paragraph in which it is first requested.

3

20.     All pages now stapled or fastened together shall be produced stapled or fastened together, and all documents that cannot be copied legibly shall be produced in their original form.

21.     Documents are to be produced in full.  If any requested document cannot be produced in full, produce it to the extent possible, indicating which document or portion of that document is being withheld and the reasons for withholding production of the document or portion of the document.

22.     If the attorney-client, work product, or other privilege is claimed as to any document requested herein, state in writing, on or before the date of production:  the nature (e.g., letter, memorandum, tape, etc.), date, subject matter and author, preparer or originator of each such document; the names of all persons to or by whom such document was furnished, directed, addressed, or received; and the basis for such claim of privilege.

23.     Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and other versions of a final document is a responsive document in its own right and must be produced.

24.     Copies of all electronic mail, computer tapes, disks (hard or floppy), cards, files, CD-ROMs, DVDs, or other storage media containing information or data responsive to the requests herein must be made (and, if necessary, translated by the defendants into reasonable usable form) and produced.

25.     All documents existing in electronic form shall be produced in electronic form in a manner to preserve, without alteration or modification, all meta-data associated with the electronic document, including without limitation file creation and modification dates.

26.     The terms defined above and the individual requests for production and inspection should be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the FRCP.

4

27.    The use of the singular form of any word includes the plural, and the use of the plural form of any word includes the singular.

28.    Unless words or terms have been given specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition.

29.    For purposes of reading, interpreting, or construing the scope of this Request, the terms used shall be in there most expansive and inclusive interpretation.  This includes:  (a) "any," "all," "each," or "every" shall mean "any, all, each and every"; (b) "and" or "or" shall mean "and/or"; and (c) "including" shall mean "including but not limited to."  The use of a verb in any particular tense shall be construed as the use of the verb in all other tenses whenever necessary to bring within the scope of a document request any documents that You might otherwise construe to be outside the scope of this Request.

30.    As specified in FRCP 26(e), this Request is a continuing one.  If, after producing the requested documents, You obtain or become aware of any further documents responsive to this Request, You are required to produce such additional documents without further demand from Plaintiffs within seven (7) days after the discovery of additional responsive information.

## REQUESTS FOR PRODUCTION

### REQUEST NO. 1
Any documents You intend to introduce at trial.

### REQUEST NO. 2
All documents relating to either of the Plaintiffs or their parents, including any and all documents that mention the Plaintiffs and/or their parents, including all student files and academic, disciplinary, counseling or other records.

### REQUEST NO. 3
All documents relating to any Policies or Procedures regarding the creation, maintenance, handling, retention, storage, destruction, disposal, archiving, use, contents, or substance of student records, files or reports.

### REQUEST NO. 4
All documents relating to the incidents and circumstances alleged in the Complaint, including, but not limited to, any statements of any person regarding the allegations in the Complaint.

### REQUEST NO. 5
All documents relating to any defense (including any affirmative defense) the Individual Defendants or Institutional Defendants have raised or will raise in response to the allegations in the Complaint.

### REQUEST NO. 6
All documents reviewed by or provided to any expert witness you have retained or considered retaining.

### REQUEST NO. 7
All documents relating to any communications between, on the one hand, either Plaintiff, or their parents, and, on the other hand, any of the Individual Defendants, the District, or the Board.

### REQUEST NO. 8
All documents contained in any personnel file of the Individual Defendants, including, but not limited to, resumes, job references, performance evaluations, job statuses, complaints or criticisms, and any background investigations.

**REQUEST NO. 9**

All documents relating to any Policies or Procedures regarding the creation, maintenance, handling, retention, storage, destruction, disposal, archiving, use, contents, or substance of personnel records, files, or reports.


**REQUEST NO. 10**

Agendas, minutes, transcripts, matters considered, and recordings of open, closed, and executive sessions from all meetings held by the District or Board at which any of the following were considered or discussed:

      (a)   the existence of harassment, discrimination, bullying, bias, or hostility toward individuals, whether by students or employees, including that based on sexual orientation or sex (including nonconformity with sex stereotypes) in any schools in the District;

      (b)   the effect of harassment, discrimination, bullying, abuse or hostility, including that based on sexual orientation or sex (including nonconformity with sex stereotypes) on its victims, perpetrators, and/or witnesses;

      (c)   Policies and Procedures relating to discrimination, harassment or related issues, whether or not they expressly mention sex, sexual orientation, sex stereotypes, or gender identity; and

      (d)   the proposal, formation, recognition, or prohibition of a gay-straight alliance, or any student club relating to sexual orientation or issues regarding gay, lesbian, bisexual, or transgender students.


**REQUEST NO. 11**

All documents relating to student outbursts, disruptions, altercations, or conflicts, including but not limited to any in which the perceived sexual orientation, sex, or gender expression of any student may have been a factor in any way, including all related disciplinary records and any documents reflecting any investigation or inquiry taken by You, or on Your behalf relating to such incidents.


**REQUEST NO. 12**

All documents relating to any formal or informal complaints lodged with any Defendant alleging or relating to physical assaults, verbal abuse, discrimination, or harassment, including that based on sex (including nonconformity with sex stereotypes) or sexual orientation, including any documents reflecting any investigation conducted or inquiry taken by You, or on Your behalf relating to such complaints.

**REQUEST NO. 13**
All documents related to the response, by any Defendant or its employees, to the incidents described in your response to the above Request Nos. 11 and 12.


**REQUEST NO. 14**
All documents containing or relating to any Policies and Procedures regarding the creation, maintenance, handling, retention, storage, destruction, disposal, archiving, use, contents, or substance of records, files, or reports relating to complaints lodged with any Individual Defendants.


**REQUEST NO. 15**
All documents containing or relating to any Policies and Procedures regarding the discipline of students, teachers, or other persons, including any drafts.


**REQUEST NO. 16**
All documents containing or relating to any Policies and Procedures governing harassment or discrimination by or against any of the Individual Defendants, students, teachers, or others while on District property, including but not limited to those governing harassment or discrimination based on sex (including nonconformity with sex stereotypes), sexual orientation, race, national origin, ethnicity, or religion.


**REQUEST NO. 17**
All documents provided as part of, or otherwise relating to, any training, instruction, or materials given or made available to students and/or employees at the Middle School or the High School regarding any Policies and Procedures governing harassment and discrimination.


**REQUEST NO. 18**
All documents in Your possession or control regarding the effects of harassment and discrimination on its victims, including but not limited to harassment and discrimination based on sex (including nonconformity with sex stereotypes) or sexual orientation.


**REQUEST NO. 19**
All documents relating to any complaints, including any disciplinary proceedings or actions, taken against or involving any of the Individual Defendants.


**REQUEST NO. 20**
All documents relating to funds received by the Institutional Defendants from the Federal Government.

**REQUEST NO. 21**

All documents that reflect, discuss, mention, or comment upon any proposed, current, or defunct gay-straight alliance in any schools in the District, including but not limited to all documents reflecting its activities, attendance and operations.

**REQUEST NO. 22**

All documents regarding any inquiry, effort or other discussion by any student or parent of a student at the High School concerning the formation of a gay-straight alliance, including any response or communications by any school employee or official.

**REQUEST NO. 23**

Any document containing or reflecting any comments or statements made by any Individual Defendant regarding people, including students, who are lesbian, gay, or bisexual, or regarding people, including students, who are gender non-conforming.

**REQUEST NO. 24**

All documents relating to any Policies and Procedures relating to student speech or association on school property during school hours.

**REQUEST NO. 25**

All documents relating to any Policies and Procedures governing or otherwise concerning the formation of extracurricular student clubs or organizations at schools of, or operated or sponsored by, the Institutional Defendants.

**REQUEST NO. 26**

All documents that list, describe, or contain records and operations notes of each of the student clubs or organizations that currently exist at the High School, or have existed since 2000.

**REQUEST NO. 27**

All documents identified in Defendants' Initial Disclosures Pursuant to FRCP 26, dated May 24, 2011, and all documents identified or referenced in any Defendant's Response to any Interrogatory.

**REQUEST NO. 28**

All statements, notes, correspondence or other documents concerning the individuals, and concerning the subjects, identified in Defendants' Initial Disclosures Pursuant to FRCP 26, dated May 24, 2011.

**REQUEST NO. 29**

All documents, including correspondence, concerning this action that have been provided to, sent to, or received from the U.S Department of Justice or any other federal, state or local governmental agency.

Dated:    May 31, 2011
          New York, NY


  s/ Thomas W. Ude, Jr.


Thomas W. Ude, Jr., Bar Number 515867        Vickie Reznik
Hayley Gorenberg, Bar Number 515453          Adam T. Humann
                                             Maura M. Klugman
                                             Alexandra P. Kolod


*Attorneys For Plaintiffs*                   *Attorneys for Plaintiffs*

LAMBDA LEGAL DEFENSE AND                     KIRKLAND & ELLIS LLP
EDUCATION FUND, INC.                         601 Lexington Avenue
120 Wall Street, Suite 1500                  New York, NY 10022-4611
New York, NY 10005-3904                      Telephone:  (212) 446 - 4800
Telephone:  (212) 809 - 8585                 Facsimile:  (212) 446 - 4900
Facsimile:  (212) 809 - 0055                 E-mail:  vickie.reznik@kirkland.com
E-mail:  tude@lambdalegal.org                E-mail:  adam.humann@kirkland.com
E-mail:  hgorenberg@lambdalegal.org          E-mail:  maura.klugman@kirkland.com
                                             E-mail:  alexandra.kolod@kirkland.com

11

**EXHIBIT D**

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------

CHARLES PATRICK PRATT and A.E.P. through her
parents and next friends Bobbi Lynn Petranchuk
and Todd Edward Petranchuk,

           Plaintiffs,

   -vs-                 7:09-cv-411(GTS/GHL)

INDIAN RIVER CENTRAL SCHOOL DISTRICT; INDIAN
RIVER CENTRAL SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK, Superintendent of
Indian River Central School District, in his
official and individual capacities; TROY
DECKER, Principal of Indian River High School,
in his official and individual capacities; and
JAY BROWN, JOHN DAVIS, KENDA GRAY, AMABLE
TURNER, PATRICIA HENDERSON, and BRIAN MOORE, in
their individual capacities,

           Defendants.

-----------------------------------------------------

              Videotaped Deposition of
              CHARLES PATRICK PRATT, Plaintiff, held
              at The Law Firm of Frank W. Miller, East
              Syracuse, New York, on February 10,
              2012, before DEBORAH R. SALESKI, Court
              Reporter and Notary Public in and for
              the State of New York.

Job No. CS378939

```
 1                  Charles Patrick Pratt

 2              MR. UDE:  Object to the form.

 3       A.    Yes.

 4       Q.    What periods between kindergarten and the

 5  second time you took 9th grade were you attending another

 6  school other than a school in the Indian River School

 7  District?

 8       A.    I attended Sacred Heart in September of 2001.

 9       Q.    How long did you attend Sacred Heart?

10       A.    I don't remember.

11       Q.    Was it more than a month?

12       A.    No.

13       Q.    Were there any other schools outside the

14  Indian River School District that you attended between

15  kindergarten and the second time you attended 9th grade?

16       A.    No.

17       Q.    What periods were you home schooled?

18       A.    That's when I left Indian River.

19       Q.    The first time or the second time?

20       A.    The first time.

21       Q.    So that would have been January of 2004?

22       A.    Yes.

23       Q.    How long were you home schooled?

24       A.    I don't remember the exact timeline, between

25  three and four months.
```

Page 50

1              Charles Patrick Pratt

2        Q.    You withdrew from school, from the Indian

3    River School District in October 2004, correct?

4              MR. UDE:  Object to the form.

5        A.    I never actually withdrew, like I never went

6    in and did a withdrawal or signed anything to withdraw.

7    That was the last day of attendance.

8        Q.    Never went back again?

9        A.    No.

10       Q.    Have you a obtained your GED?

11       A.    Yes.

12       Q.    You understand what I mean when I say GED?

13       A.    Yes.

14       Q.    When did you get that?

15       A.    I received my GED in April of 2006.

16       Q.    Did you get it on your first attempt?

17       A.    Yes.

18       Q.    Have you attended any colleges?

19       A.    Yes.

20       Q.    How many?

21       A.    Three.

22       Q.    What are they?

23       A.    Jefferson Community College.

24       Q.    Mm-mm.

25       A.    Buffalo State College and the University at

Page 57

Charles Patrick Pratt

1

2     Q.    Does that sound right?

3           MR. UDE:  Object to the form.

4     A.    Around, yes.

5     Q.    What grades do the primary schools at the

6 Indian River School District cover?  Or let me rephrase

7 that.

8          What grades did the primary schools in Indian

9 River School District cover when you attended primary

10 school?

11    A.    Kindergarten through 4th grade.

12    Q.    There were three primary schools at that time?

13    A.    There was -- do you mind if I list them?

14    Q.    No, not at all.

15    A.    There was Evan Mills, Calcium, Antwerp,

16 Theresa, so four.  Five, four.

17    Q.    Which of the primary schools did you attend?

18    A.    I attended Theresa Primary and Evan Mills

19 Primary.

20    Q.    What years did you attend Theresa?

21    A.    I'm trying to think.

22    Q.    I'm sorry, I should say what grades did you

23 attend at Theresa?

24    A.    Kindergarten through second grade.

25    Q.    And then you attended Evan Mills for 3rd

Page 58

Charles Patrick Pratt

1    through 4th?

2    A.   Yes.

3    Q.   What grades did the middle school cover when

4    you attended middle school at the Indian River School

5    District?

6    A.   Five through eight.

7    Q.   Was the intermediate school in existence when

8    you attended middle school?

9    A.   No.

10   Q.   Do you know what grades the middle school and

11   the intermediate school cover now?

12   A.   The middle school is 6th through 8th, the

13   intermediate building is four and five.

14   Q.   Do you know when that started?

15   A.   I can't remember.

16   Q.   It was after you attended middle school?

17   A.   Yes.

18   Q.   Did the intermediate school start up when you

19   were still attending high school at Indian River?

20   A.   I don't know if it started up.  I remember it

21   being built.  Like I remember seeing construction from

22   the highway.

23   Q.   And then the high school covered grades 9th

24   through 12 when you attended Indian River School

Page 59

1                      Charles Patrick Pratt

2     District?

3          A.    Yes.

4                    MR. UDE:  Object to the form.

5          Q.    So at the high school there were about four

6     classes of roughly 200 plus students at any given time?

7                    MR. UDE:  Object to the form.

8          A.    Yes.

9          Q.    Would you characterize the students who

10    attended the Indian River high school when you were going

11    there as overall a rowdy bunch?

12                   MR. UDE:  Object to the form.

13         A.    There was like some groups of people.

14         Q.    In the hallways between classes was it --

15    could it be loud?

16                   MR. UDE:  Object to the form.

17         A.    Yes.

18         Q.    Would it be regularly loud?

19                   MR. UDE:  Object to the form.

20         A.    Yes.

21         Q.    Between classes would it be fair to say that

22    there was a lot of the activity in the hallways when you

23    were attending Indian River high school?

24                   MR. UDE:  Object to the form.

25         A.    Yes.

Page 62

Charles Patrick Pratt

1

2    Q.    When you were attending Theresa and Evan Mills
3    primary schools, do you ever remember visiting the middle
4    school or high school?

5    A.    No.

6    Q.    When you were attending the Indian River
7    Middle School, do you remember visiting either the
8    primary -- any of the primary schools or the high school?

9    A.    I remember visiting the high school.

10   Q.    How many times?

11   A.    I don't know the exact number.  I remember at
12   least once.

13   Q.    Do you remember was it less than ten times?

14   A.    Yes.

15   Q.    Was it less than five times?

16   A.    Yes.

17   Q.    When you were attending the Indian River High
18   School, do you remember visiting either the -- any of the
19   primary schools or the middle school or the intermediate
20   school?

21        MR. UDE:  Object to the form.

22   A.    No.

23   Q.    When you were at the middle school, who was
24   the principal of the middle school?

25   A.    Mr. DeForrest.

Page 234

1                    Charles Patrick Pratt

2    only club he listed?

3         A.    It was.

4         Q.    You never participated in your sister's

5    attempts to start a GSA, did you?

6         A.    No.

7                    MR. UDE:  Object to the form.

8         Q.    Did you have any discussions with your sister

9    about starting a GSA?

10        A.    Yes.

11        Q.    Have you ever met Matthew Deem?

12        A.    I've never met him in person, no.

13        Q.    Have you had communication with him?

14        A.    Yes.

15        Q.    When was the first time?

16        A.    It was soon after the initial Complaint was

17   filed.

18        Q.    Do you know if you were ever in the same

19   school building as Mr. Deem?

20        A.    I was not.

21        Q.    Have you ever met Tawny Grant?

22        A.    I have not.

23        Q.    Have you ever had any communications with

24   Tawny Grant?

25        A.    No.

Page 235

1            Charles Patrick Pratt

2       Q.    Do you know if you ever in the same school

3    building as Tawny Grant?

4       A.    I was not.

5       Q.    Let me ask you to direct your attention again

6    to Exhibit 17 and you're looking for page 28.

7       A.    Okay.

8       Q.    Did you provide an information packet to your

9    sister about starting a GSA?

10      A.    Yes.

11      Q.    Was that information packet created by the

12   Gay, Lesbian and Straight Education Network?

13      A.    It was.

14      Q.    At the time you spoke to Ashley about starting

15   a GSA had you decided to bring litigation against the

16   school district?

17            MR. UDE:   Object to the form.

18      A.    I had not.

19      Q.    Were you considering starting litigation

20   against the school district at that time?

21      A.    I was not.

22            MR. SPAGNOLI:   It's about 4:30.   I know

23            you folks have a plane to catch, so I think

24            this is an appropriate time to break subject

25            to reconvening this deposition on March 9.

**EXHIBIT E**

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

----------------------------------------------------

CHARLES PATRICK PRATT and A.E.P. through her

parents and next friends Bobbi Lynn Petranchuk

and Todd Edward Petranchuk,

            Plaintiffs,

    -vs-                    7:09-cv-411(GTS/GHL)

INDIAN RIVER CENTRAL SCHOOL DISTRICT; INDIAN

RIVER CENTRAL SCHOOL DISTRICT BOARD OF

EDUCATION; JAMES KETTRICK, Superintendent of

Indian River Central School District, in his

official and individual capacities; TROY

DECKER, Principal of Indian River High School,

in his official and individual capacities; and

JAY BROWN, JOHN DAVIS, KENDA GRAY, AMABLE

TURNER, PATRICIA HENDERSON, and BRIAN MOORE, in

their individual capacities,

            Defendants.

----------------------------------------------------

            Deposition of ASHLEY PETRANCHUK,

            Plaintiff, held at The Law Firm of

            Frank W. Miller, East Syracuse, New

            York, on February 7, 2012, before

            DEBORAH R. SALESKI, Court Reporter and

            Notary Public in and for the State of

            New York.

Job No. CS378652

Page 50

1              Ashley Petranchuk

2         Q.    So turning again to your middle school time,

3    you started at the beginning of the 2004 to 2005 school

4    year?

5         A.    Yes.

6         Q.    And you finished at the middle school -- well,

7    let me stop there.  Let me withdraw the question.

8              When you started at the middle school, was

9    Charlie already at the high school?

10        A.    Yes.

11        Q.    And you finished middle school at the end of

12   the 2006 to 2007 school year?

13        A.    Yes.

14        Q.    Then you attended Indian River High School

15   from 9th through 12th grade?

16        A.    Yes.

17        Q.    You started at the beginning of the 2007 to

18   2008 school year?

19        A.    Yes.

20        Q.    Charlie had already dropped out of high school

21   several years before that, correct?

22        A.    Yes.

23              MS. KOLOD:  Object to form.

24        Q.    And you finished high school with Indian River

25   at the end of the 2010 to 2011 school year?

1          Ashley Petranchuk

2     A.    Yes.

3     Q.    Graduated in June of 2011?

4     A.    Yes.

5     Q.    By the time you got to the Indian River High

6  School was Mr. Decker the principal?

7     A.    Yes.

8     Q.    When you started high school, was Mr. Kettrick

9  the superintendent?

10    A.    Yes.

11    Q.    And, if you know, did they hold those

12 positions through the time that you graduated from high

13 school?

14    A.    Yes.

15    Q.    For the school years 2007 to 2008 and 2008 to

16 2009, that would be your freshman and sophomore years,

17 was Jay Brown the assistant principal at the high school?

18    A.    Yes.

19    Q.    And he stopped being assistant principal after

20 the 2008 to 2009 school year, if you know?

21    A.    I think to be the sports director or whatever.

22    Q.    The athletic director?

23    A.    Yes.

24    Q.    Okay.  So that would be for the school years

25 2010 to 2011 -- excuse me 2009 to 2010 on?

# EXHIBIT F

Case 7:09-cv-00411-GTS-TWD Document 126-8 Filed 11/19/12 Page 88 of 99

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHARLES PATRICK PRATT and A.E.P.
through her Parents and Next Friends
BOBBI LYNN PETRANCHUK and TODD EDWARD
PETRANCHUK,

              Plaintiffs,

   -vs-      7:09-CV-411 (GTS/TWD)

INDIAN RIVER CENTRAL SCHOOL DISTRICT;
INDIAN RIVER CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central
School District, in his official and
individual capacities; TROY DECKER,
Principal of Indian River High School,
in his official and individual
capacities; and JAY BROWN, JOHN DAVIS,
KENDA GRAY, AMABLE TURNER, PATRICIA
HENDERSON and BRIAN MOORE, in their
individual capacities,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF JAMES KETTRICK

Syracuse, New York

March 15, 2012

9:29 a.m.

REPORTED BY:

PAMELA PALOMEQUE

REF: 7002

ORIGINAL

1      A.    I -- improve the climate?  I didn't think the

2  climate was bad when I was there.

3      Q.    Do you think that people were more accepting

4  of gay students in 2006 when you left than they were in

5  2000 or no difference?

6      A.    I would say no difference.  The students

7  really got along in Indian River.  It's a very diverse

8  population.  I was pretty proud of that.

9      Q.    Have things changed substantially since you

10  left or has it remained largely the same?

11      A.    I would say in the last two years particularly

12  there's a tremendous amount of national attention on

13  bullying.  And gay rights at this point is -- stands at

14  the forefront of civil rights actions.

15           The anti-bullying -- the high profile suicides

16  that have taken place the last couple years, Tyler

17  Clementi, Jamey Rodemeyer, that schools are at the

18  epicenter of this problem and we need to make sure we're

19  addressing bullying.

20      Q.    Is your view on the environment of the high

21  school while you were principal with respect to gay

22  students, do you think it was the same throughout, from

23  '93 to 2006?

24           MR. SPAGNOLI:  Objection to form.

25      A.    I would say the same.

```
 1              deposition of James Kettrick.
 2              (Kettrick Exhibit 12, CP-AP0000133,
 3              6/20/96 article from Watertown Daily Times,
 4              marked for identification, this date.)
 5      Q.   Mr. Kettrick, the Court Reporter has handed
 6   you what's been marked for identification purposes as
 7   Kettrick Exhibit 1.  This is not from Defendants'
 8   production.  It's a two-page document from Plaintiffs'
 9   production Bates marked CP-AP0000133.
10              I'll give you a moment to review the article
11   and then I'll have a couple questions for you.
12      A.   Okay.
13      Q.   Have you seen this article before?
14      A.   Yes, I have.
15      Q.   When did you see it.
16      A.   I don't know exactly when it was given to me.
17      Q.   Did you read it on or about when it was
18   published in 1996?
19      A.   I don't believe so.
20      Q.   Did you -- was it '97 when you read it?
21      A.   I believe later.
22      Q.   How much later?
23      A.   I can't really recall.
24      Q.   Was it 2010?
25      A.   Somewhere along that time frame.
```

Page 292

1     Q.    It's more recent; it's not contemporaneous?

2     A.    I don't recall this from 199 -- when was this

3     published?  1996.

4     Q.    You recall reading it substantially after

5     1996?

6     A.    Yes.

7     Q.    Do you know who Taunee Grant is?

8     A.    Yes, I do.

9     Q.    Who is she?

10    A.    She's a student at Indian River.

11    Q.    When was she a student?

12    A.    The year I arrived.

13    Q.    If I could direct you to paragraph 2, it reads

14    in the section listing the senior class will, the 1994

15    Indian River High School graduate wrote that "She hoped

16    those who were gay or lesbian could find solace, not

17    isolation in a place they can learn."  Did I read that

18    correctly?

19    A.    Yes, you did.

20    Q.    Did Ms. Grant ever discuss having any issues

21    with respect to the high school and it being a place

22    where a gay or lesbian students could find solace?

23              MR. SPAGNOLI:  Objection, form and

24              foundation.  Discuss with who?

25    Q.    You're right, I left out you, which would be

1    helpful.  Did Miss Grant ever discuss with you having any

2    issues?

3         A.    She never did.

4         Q.    She never did?

5         A.    No.

6         Q.    Just strike that first question.

7               Did Miss Grant ever discuss having any issues

8    with respect to the high school being a place where a gay

9    or lesbian student can find solace with you?

10        A.    No, she did not.

11        Q.    Did you read her comment in the 1994 yearbook?

12        A.    Yeah, that was brought to my attention, not

13   this article but that was brought to my attention.

14        Q.    Do you remember when that was brought to your

15   attention?

16        A.    Very late that year.

17        Q.    And that would have been 1994?

18        A.    Yes.

19        Q.    What did you think when you read that?

20        A.    I thought we better get somebody to talk to

21   her.  I want to find out what's going on.

22        Q.    Did you think that you needed to do any

23   investigation of the high school?

24        A.    Yes, by speaking with her about the article.

25        Q.    By speaking with who?

Page 294

1          A.     Taunee Grant.

2          Q.     Did you speak with Taunee?

3          A.     No, I didn't.  I asked someone else to do it.

4          Q.     And did they?

5          A.     Yes, they did.

6          Q.     And what did they report to you?

7          A.     That she -- the report that I got was that she

8    really didn't have any serious concerns with the school.

9    It was more her family, her mom and dad that were the

10   real issue.  She said -- she said overall her experience

11   at Indian River was very, very good.

12              I recall her as a very successful student in a

13   lot of different ways.  I knew if I reached out to her

14   and she doesn't have a comfort level with me, because I

15   came up there in November.  She and I spoke several

16   times, but her counselor, Suzanne Kiernan would have

17   spoken with her and I asked her about that, and she did.

18         Q.     Who did you have speak to Ms. Grant?

19         A.     A guidance counselor at the time named,

20   Suzanne Kiernan.

21         Q.     About -- it's eight short paragraphs down but

22   there's a sentence that begins "My teachers were good."

23   Do you see that?

24         A.     My teachers were good, yeah.

25         Q.     The sentence reads in full:  "My teachers were

Page 295

1    good.  There was only one teacher that seemed to have a

2    problem with it," said Ms. Grant.  Did Ms. Kiernan -- did

3    I pronounce her name correctly?

4         A.    Mm-hmm.

5         Q.    Did Ms. Kiernan discuss who that teacher was

6    with Ms. Grant?

7                   MR. SPAGNOLI:  Objection.  Assumes facts

8                   not in evidence.

9         A.    This is a 1996 article.  I don't know if this

10   comment would have been made to Mrs. Kiernan in 1994 just

11   after graduation.  Taunee's issues seemed to be more with

12   Mom and Dad and the fact that she had come out.  I don't

13   recall much more than that.  Mrs. Kiernan said her main

14   concern was her relationship with Mom and Dad, that she

15   basically had an overall positive experience at school.

16        Q.    Do you know if she expressed to Ms. Kiernan

17   any concern about a teacher having issues with her

18   sexuality?

19        A.    Mrs. Kiernan didn't mention anything about any

20   particular teacher.

21        Q.    Do you know if there were any openly gay high

22   school students at the high school at the time of

23   Ms. Grant's graduation?

24        A.    I thought there were a few.  I just can't

25   think of who they are.  No, I can't think of any.

Page 296

1      Q.    Do you know if Ms. Kiernan created a written

2 report in connection with her reaching out to Ms. Grant?

3      A.    I don't recall if she did or didn't.  I don't

4 believe she did.

5               (Kettrick Exhibit 13, CP-AP0000003,

6               3/6/06 Watertown Daily Times article, marked

7               for identification, this date.)

8      Q.    Mr. Kettrick, the Court Reporter has handed

9 you what's been marked as Kettrick Exhibit 13.  It's an

10 article from the Watertown Times from November -- excuse

11 me, March 2006.  Just a very brief question for you

12 whenever you're ready.

13      A.    Okay.

14      Q.    Did you read this article when it came out?

15      A.    Oh, I read it because I was called for a

16 quote.

17      Q.    Did they get your quotes right in this

18 article?

19      A.    Basically -- what did I say exactly?  "The

20 atmosphere they say exists simply does not.  Students of

21 alternative life styles can get along with other students

22 in any north country school."

23      Q.    Did they get your quotes correct?

24      A.    It was a little expansive on the north country

25 school thing.  It should have just been Indian River.

**EXHIBIT G**

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------

CHARLES PATRICK PRATT and A.E.P.
through her Parents and Next Friends
BOBBI LYNN PETRANCHUK and TODD EDWARD
PETRANCHUK,

              Plaintiffs,

   -vs-       7:09-CV-411 (GTS/TWD)

INDIAN RIVER CENTRAL SCHOOL DISTRICT;
INDIAN RIVER CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central
School District, in his official and
individual capacities; TROY DECKER,
Principal of Indian River High School,
in his official and individual
capacities; and JAY BROWN, JOHN DAVIS,
KENDA GRAY, AMABLE TURNER, PATRICIA
HENDERSON and BRIAN MOORE, in their
individual capacities,

              Defendants.

-------------------------------------------------

DEPOSITION OF JAY BROWN

Syracuse, New York

March 22, 2012

REPORTED BY:

PAMELA PALOMEQUE

REF: 7078

COPY

Page 16

| | | |
|---|---|---|
| 1 | Q. | Drove down this morning? |

1     Q.    Drove down this morning?

2     A.    To Syracuse, yes.

3     Q.    What did you discuss?

4     A.    Like I said, "How are you feeling?  Did you

5  sleep well?"  Things like that.

6     Q.    Did you bring any documents with you today?

7     A.    I did not.

8     Q.    By whom are you currently employed?

9     A.    Indian River Central School District.

10    Q.    How long have you been employed by Indian

11  River Central School?

12    A.    Approximately 28 years.

13    Q.    And what is your current position?

14    A.    I am the Athletic Director.

15         MR. SPAGNOLI:  Counsel, do you have

16         another copy of this?

17         (Brown Exhibit 2, Defendants' Answer to

18         First Set of Interrogatories to Individual

19         Defendants, marked for identification, this

20         date.)

21    BY MR. UDE:

22    Q.    Mr. Brown, I'm showing you -- you have before

23  you what's been marked as Exhibit 2.  Do you recognize

24  that document?

25    A.    I do.

```
 1        A.    Yes.

 2        Q.    How many?  How many when you were Assistant

 3   Principal, first?

 4        A.    Again I would say 10 to 25.

 5        Q.    While you were Assistant Principal?

 6        A.    Yes.

 7        Q.    What about overall?

 8        A.    Through --

 9        Q.    By overall I mean throughout your time at the

10   high school.

11        A.    Again, I hesitate to put any type of number on

12   something like that over the years.  I mean, I --

13        Q.    Too many to count?

14              MR. SPAGNOLI:  Objection.

15        A.    That's not what I mean.  It's just I can't

16   give any type of accurate number.  I can throw a number

17   out there but it would again be just a number because I

18   really can't -- over 28 years it's hard to say.

19        Q.    So the 10 to 25 is within about three years?

20        A.    I would say that's fairly accurate.

21        Q.    Under what circumstances -- what were the

22   circumstances in which you heard those words being used?

23        A.    Again, similar situations:  Students walking

24   down the hall.  One might say, you know, we have to go to

25   this class.  I don't really want to go because it's gay.
```