# DESIGNATION OF RECORD ON APPEAL


# EXHIBIT 10

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES PATRICK PRATT and
A.E.P. through her parents and next friends Bobbi Lynn
Petranchuk and Todd Edward Petranchuk,

        Plaintiffs,

    - vs. -

INDIAN RIVER CENTRAL SCHOOL
DISTRICT; INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK, Superintendent of
Indian River Central School District, in his official and
individual capacities; TROY DECKER, Principal of
Indian River High School, in his official and individual
capacities; and JAY BROWN, JOHN DAVIS, KENDA
GRAY, AMABLE TURNER, PATRICIA HENDERSON,
and BRIAN MOORE, in their individual capacities,

        Defendants.

7:09-cv-411 (GTS/TWD)
ECF Case

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SECOND AMENDED MOTION IN LIMINE AND FOR A PROTECTIVE ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 2
 A. General Background and the District Environment Information .......................... 2
 B. The January 3, 2012 Order .................................................................................. 4
 C. The 30(b)(6) Deposition Notice .......................................................................... 6

ARGUMENT ...................................................................................................................... 7

I. DEFENDANTS ARE NOT ENTITLED TO ANY PROTECTIVE ORDER LIMITING DISCOVERY SEEKING DISTRICT ENVIRONMENT INFORMATION. ......................................................................................................... 7
 A. Discovery Seeking District Environment Information In Schools Before The Dates Of Plaintiff Pratt's Attendance Is Proper Because It Is Relevant To, *Inter Alia,* Defendants' Notice Of Harassment Or Discrimination. ................ 8
 B. Discovery Seeking District Environment Information In Other Schools And/Or That Pre-Dates Plaintiff Pratt's Attendance At A Particular School Is Proper Because Such Evidence Is Relevant To Pervasiveness And Hostility Of The District's Environment. .............................................................. 10
 C. Discovery Seeking District Environment Information Post-Dating Plaintiff Pratt's Tenure In The District Is Proper Because The Evidence Is Relevant to Feasibility or Similar Factors .......................................................................... 12
 D. District Environment Information Is Properly Discoverable Because It Is Relevant To Defendants' Motives In Denying Requests To Form A GSA .......... 13
 E. District Environment Information Is Properly Discoverable Because It Is Relevant To Plaintiffs' Claims For Punitive Damages .................................... 14
 F. Even If District Environment Information Were Not Relevant, Efforts to Seek It Are Still Within The Scope Of Permissible Discovery. ........................ 15

II. THE JANUARY 3, 2012 ORDER DOES NOT BAR DISCOVERY OF DEFENDANTS' DOCUMENT RETENTION ACTS AND PRACTICES. .............. 17
 A. Information Regarding The Actual Retention Or Destruction Of Documents Within The Scope Of Discovery Is Not Privileged ......................... 18
 B. The January 3, 2012 Order Is Not a Protective Order .................................... 19

III. THIS COURT SHOULD DIRECT DEFENDANTS' COUNSEL TO MEET AND CONFER WITH PLAINTIFFS' COUNSEL CONCERNING PLAINTIFFS' 30(B)(6) NOTICE, WHICH IS NOT PROPERLY BEFORE THIS COURT ................................................................................................................ 20

CONCLUSION ................................................................................................................. 25

Case 7:09-cv-00411-GTS-TWD Document 126-13 Filed 04/19/12 Page 4 of 56

## TABLE OF AUTHORITIES

**Cases**

*Abdullah v. Panko Elec. & Maint., Inc.*,
   3:08-CV-0579, 2011 U.S. Dist. LEXIS 29663 (N.D.N.Y Mar. 23, 2011) .............................. 11

*BMW of N. Am. Inc. v. Gore*,
   517 U.S. 559 (1996) .................................................................... 15

*Colohan v. Genie Indus.*,
   276 F.R.D. 161 (S.D.N.Y. 2011) ...................................................... 13

*Crandell v. N.Y. Coll. of Osteopathic Med.*,
   87 F. Supp. 2d 304 (S.D.N.Y. 2000) .................................................. 9

*DiSorbo v. Hoy*,
   343 F.3d 172 (2d Cir. 2003) ........................................................... 15

*Doe v. Sch. Admin. Dist. No. 19*,
   66 F. Supp. 2d 57 (D. Me. 1999) ..................................................... 9

*Ericson v. Syracuse Univ.*,
   35 F. Supp. 2d 326 (S.D.N.Y. 1999) .............................................. 9, 10

*Folkes v. N.Y. Coll. of Osteopathic Med.*,
   214 F. Supp. 2d 273 (E.D.N.Y. 2002) ................................................ 8

*In re eBay Seller Antitrust Litig.*,
   No. 07-CV-01882 (RS), 2007 WL 2852364 (N.D.Cal. Oct. 2, 2007) .................... 18

*Johnson v. Galen Health Insts., Inc.*,
   267 F. Supp. 2d. 679 (W.D. Ky. 2003) ............................................... 9

*Lee v. Edwards*,
   101 F.3d 805 (2d Cir. 1996) ........................................................... 15

*Leibovitz v. N.Y. City Transit Authority*,
   252 F.3d 179 (2d Cir. 2001) ........................................................... 12

*Lugosch v. Congel*,
   218 F.R.D. 41 (N.D.N.Y. 2003) ....................................................... 7

*Major Tours, Inc. v. Colorel*,
   No. 05-3091 (JBS/JS), 2009 WL 2413631 (D.N.J. Aug. 4, 2009) ................... 18, 19

*Mitchell v. Fishbein*,
   227 F.R.D. 239 (S.D.N.Y. 2005) ...................................................... 16

*Perry v. Ethan Allen, Inc.*,
   115 F.3d 143 (2d Cir. 1997) ........................................................... 11

*Rosen v. Thornburgh*,
   928 F.2d 528 (2d Cir. 1991) ........................................................... 13

*Sandoval v. Am. Bldg. Maint. Indus.*,
   578 F.3d 787 (8th Cir. 2009) .......................................................... 11

*Sauerhaft v. Bd. of Educ.*,
    05 Civ. 09087 (PGG), 2009 U.S. Dist. LEXIS 46196 (S.D.N.Y. June 1, 2009) ....................... 9

*Swift v. Mauro*,
    5:09-cv-899 (NAM/GJD), 2008 U.S. Dist. LEXIS 52203 (N.D.N.Y. Jul. 7, 2008) ................ 14

*Theno v. Tonganoxi Unified Sch. Dist. No. 464*,
    377 F. Supp. 2d 952 (D. Kan. 2005) ....................................................................... 13

*Tracy v. NVR, Inc.*,
    No. 04-CV-6541L, 2012 WL 1067889 (W.D.N.Y March 26, 2012) ........................................ 18

*U.S. v. Bonanno Organized Crime Family of La Cosa Nostra*,
    119 F.R.D. 625 (E.D.N.Y 1988) ...................................................................... 19

*Vance v. Spencer Cnty. Pub. Sch. Dist.*,
    231 F.3d 253 (6th Cir. 2000) ........................................................................ 11, 13

*Zubulake v. UBS Warburg LLC*,
    382 F. Supp. 2d 536 (S.D.N.Y. 2005) ............................................................ 11

**Statutes**

20 U.S.C. § 4071(a) ................................................................................. 13

42 U.S.C. §1983 ...................................................................................... 8, 10

**Rules**

Fed. R. Civ. P. 26(b)(1) ............................................................................ 7, 16

Local Rule 7.1(b)(2) ............................................................................ 21, 22, 25

Local Rule 7.1(d) ................................................................................. 21, 24, 25

NYCRL §40-c(2) ...................................................................................... 13

## PRELIMINARY STATEMENT

On April 24, 2012, the above-captioned Defendants filed their Motion in Limine and for Protective Order (with supporting papers, the "Motion"). The Motion sought to preclude Plaintiffs from seeking discovery, and introducing evidence at trial, concerning incidents of harassment or discrimination similar to those experienced by Plaintiff Charles Pratt if those incidents occurred when he was not enrolled for instruction at or attending a given Indian River Central School District ("District") school (the "District Environment Information").

On May 1, 2012, Judge Glenn T. Suddaby properly denied as premature and unripe the portions of Defendants' Motion that sought to preclude Plaintiffs from introducing District Environment Information at trial, leaving at issue only those portions of Defendants' Motion that sought to preclude Plaintiffs from discovery seeking such information. What remained of Defendants' Motion comprised a single page of memorandum, bereft of precedent, in which Defendants baldly assert that "whether a high school student shoved another student in the belief that the second student was gay in 1997 is unlikely to lead to evidence pertaining to Charles Pratt's experience at the High School in 2002[.]" (Defendants' Memorandum of Law Supporting Motion in Limine and for Protective Order ("Motion MOL"), Dkt. 106-10, at 22.) Contrary to Defendants' claims, evidence of incidents like this one (and Defendants cannot seriously contend that discovery will reveal only a single isolated incident) and evidence of Defendants' response, if any, is *directly* relevant to the pervasiveness of sexist and antigay harassment in the District, Defendants' notice of the hostile environment created by such harassment, and Defendants' responses to such harassment – elements of several of Plaintiff Pratt's claims. Defendants' cramped understanding of the relevant law is unsupported and their motion seeking to limit discovery must be denied.

On May 17, 2012, Defendants unilaterally and in violation of various Local Rules of Practice of the United States District Court for the Northern District of New York (the "Local Rules") filed Defendant's [sic] Supplemental Memorandum of Law Supporting Motion in Limine and for Protective Order (with supporting papers, the "Supplemental Motion"). Defendants' Supplemental Motion raised two new issues: (1) whether Defendants may refuse to answer questions relating to their document retention practices based on an unspecified privilege of uncertain scope and (2) whether Plaintiffs may proceed with the deposition, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure ("Rule 30(b)(6)" of the "FRCP"), of the District and Board of Education (the latter the "Board").

Although Plaintiffs dispute that the issues in the Supplemental Motion are properly before this Court, Plaintiffs believe the first issue is sufficiently narrowed and in dispute to merit this Court's attention. As to the second issue, however, Defendants should not be permitted to flout this Court's Local Rules and ask this Court to intervene where Defendants shirk their basic obligation as a party to a litigation: working in good faith with Plaintiffs to reach a mutually satisfactory Rule 30(b)(6) deposition plan. The Court should deny this portion of Defendants' Supplemental Motion and direct Defendants to confer with Plaintiffs' counsel.

## BACKGROUND

### A. General Background and the District Environment Information.

Plaintiffs Charles Pratt ("Charlie") and A.E.P. initiated this action on April 8, 2009. (Dkt. 1.) On July 1, 2009, Plaintiffs sought leave to file an amended complaint. (Dkt. 33.) On February 9, 2010, over Defendants' opposition, this Court granted Plaintiffs' motion for leave to amend, and on February 10, 2010, Plaintiffs filed their First Amended Complaint (the "Amended Complaint" or "FAC"). (Dkt. 44.) In the Amended Complaint, Plaintiff Charles Pratt asserts claims under the First Amendment, Equal Protection Clause, Title IX, and various state statutes

relating to discrimination and harassment he experienced while attending schools in the District. Charlie's claims include allegations that the District and other Defendants denied him access to an equal education based on his sex and his actual and perceived sexual orientation when they:

> deliberately, purposefully, and intentionally failed to undertake reasonable or appropriate investigative, disciplinary, preventive, remedial, or corrective measures in response to the antigay and sexist harassment alleged herein, despite the ability and authority to do so on behalf of the School District, and despite actual knowledge that the harassment was occurring to Charlie and had been occurring to other students as early as 1994."

(FAC ¶ 122.)  In addition to asserting claims for a hostile education environment, the Amended Complaint also alleges that Defendants Kettrick, the District, and the Board refused to permit the formation of a Gay-Straight Alliance ("GSA") at the Indian River High School (the "High School") despite requests by Charlie and another student, and that those refusals were discriminatory, illegal, and unconstitutional.  (FAC ¶¶ 84-93.)

Charlie attended schools in the District beginning in 1993, and attended the High School from 2002 to 2004.  (FAC ¶¶ 20.)  The Amended Complaint also alleges that the hostile environment at the High School existed long before Charlie arrived and that Defendants had notice and opportunity to address it – but failed to do so.  For example, Taunee Grant, Matthew Deem, and Gregory VanHoesen are three former students discussed in the Amended Complaint who suffered harassment and discrimination at the High School on the basis of sexual orientation and/or gender non-conformity.  (*See* FAC ¶¶ 106-109 (Taunee Grant, enrolled from 1990-94); 110-112 (Matthew Deem, enrolled from 1994-98); FAC ¶¶ 60-65 (Gregory VanHoesen, enrolled 2001-04).)  Each of them describes strikingly similar experiences of name calling by students, witnessed by staff and employees who failed to respond appropriately, and efforts to escape harassment by avoiding particular areas within the school (e.g. certain hallways and gym class). (*See* FAC ¶¶ 53-76; 105-111.)

In addition to Charlie's claims, the Amended Complaint asserts claims on behalf of
Plaintiff A.E.P., Charlie Pratt's sister.  Specifically, the Amended Complaint alleges that
Defendants Kettrick, Jay Brown, Troy Decker, and the District and Board refused to permit the
formation of a GSA despite repeated requests from A.E.P. and other students.  (FAC ¶¶ 94-100.)
These refusals, especially in light of these Defendants' knowledge of the High School's hostile
antigay environment, were discriminatory, illegal, and unconstitutional.  (*Id.*)

On June 11, 2010, Defendants filed a Motion to Dismiss/Motion for Summary Judgment
(the "MTD/MSJ," Dkt. 56.)  Although by that motion Defendants challenged many of the claims
discussed above, Defendants never moved to strike any allegations as improper under Rule 12(f)
of the FRCP – including allegations concerning District Environment Information.  On March
29, 2011, this Court denied the large majority of Defendants' Motion to Dismiss/Motion for
Summary Judgment (Dkt 77).

The parties commenced written discovery in May 2011.  Defendants' initial responses to
Plaintiffs' Interrogatories and Production Requests contained no objections to any discovery
request, including to the time period (specifically, from 1990 to the present for many items) as to
which Plaintiffs sought discovery.  Defendants' supplemental discovery responses, served six
months later, included untimely purported objections, although Defendants repeatedly assured
Plaintiffs that no information or documents had been withheld on the basis of any objection.

**B.    The January 3, 2012 Order**

In late 2011, Plaintiffs became concerned that Defendants had not taken proper steps to
preserve documents related to this litigation.  Accordingly, during a status conference with Judge
Lowe on December 15, 2011, Plaintiffs sought:  (1) Defendants' litigation hold memoranda,
(2) related distribution lists, and (3) an explanation of other actions taken to fulfill Defendants'
duty to preserve documents.  Plaintiffs made this request to Judge Lowe because the first two

categories are typically privileged; Plaintiffs could not acquire such information absent a Court order. The third category, however, contains some privileged and some non-privileged elements. During the conference, Judge Lowe asked the parties to submit briefing on the legal standard for overcoming the privilege ordinarily protecting such information. (*See* December 15, 2012, Text Minute Entry for Proceedings Held before Magistrate Judge George H. Lowe.)

In response to Judge Lowe's request, on December 20, 2011, Plaintiffs submitted a letter brief addressing the showing required to obtain otherwise privileged information regarding document retention. (*See* Dec. 20, 2011 Letter from Plaintiffs to Judge Lowe, Dkt. 97). Defendants' response described the relief sought by Plaintiffs similarly – as a "request that this Court invade the attorney-client privilege and work product protection by ordering Defendants to disclose litigation holds and documentation preservation efforts." (December 27, 2011 Letter from Defendants to Judge Lowe, Dkt. 98.) On January 3, 2012, Judge Lowe denied Plaintiffs' request, stating: "The Court finds that Plaintiffs have not made a sufficient showing of spoliation of evidence, and therefore Plaintiffs' request is denied." Judge Lowe did not grant any relief to Defendants, as none had been sought.

Defendants now advance the untenable position that Judge Lowe's text order prohibits Plaintiffs from discovering ***any*** information, regardless of privilege, related to Defendants' document retention or preservation practices. For example, at the March 22, 2012 deposition of Defendant Jay Brown, Defendants' counsel instructed Mr. Brown not to answer questions concerning the existence of an original note written by him even though (a) no privilege was asserted, (b) Mr. Brown testified that the note was incorporated into his interrogatory answers, and (c) Mr. Brown testified that he could no longer verify whether the texts of his handwritten note and his interrogatory answer differ. (*See* Tr. of March 22, 2012 Deposition of Jay Brown,

134:3-136:24, Dkt. No. 110-2.)  Then, at the May 11, 2012 deposition of Defendant Kenda Gray,

Defendants' counsel instructed Ms. Gray not to state whether she has deleted computer files

pertaining to student discipline:

> Q.   Where do you keep the e-mails pertaining to student discipline?
>
> A.   They're right under my own file.  I'm not 100 percent sure without looking at my computer because I haven't wroten [phon] anybody up, so I haven't had to save any this year.  Every year, we clean out our files.  I just delete all my files on the computer.
>
> Q.   When's the last time you deleted all of your files from the computer?
>
> A.   From –
>
> MR. SPAGNOLI:  I'm going to object to this line of questioning as it gets into the question of document preservation, which is contrary to the Court's order of January 3, 2012 as beyond the scope of discovery permitted to plaintiffs.
>
> MR. GRETCH:  I can't ask whether she deleted documents pertaining to student discipline?
>
> MR. SPAGNOLI:  If you want to confine your question to prior to the start of this litigation, I would view that as outside the scope of the order, but beyond that – I've given you some latitude on this, counsel.

(June 4, 2012 Declaration of Alexandra P. Kolod (the "Kolod Decl."), ¶ 3, Ex. A, Excerpt from

Tr. of May 11, 2012 Deposition of Kenda Gray, 39:10-40:11.)

### C.   The 30(b)(6) Deposition Notice

On May 14, 2012, Plaintiffs served a notice of deposition pursuant to Federal Rule of

Civil Procedure 30(b)(6) (the "30(b)(6) Notice").  On May 16, 2012, Defendants wrote to

Plaintiffs' counsel setting forth "a sample" of Defendants' concerns relating to the

30(b)(6) Notice and noting that Defendants' designee(s) would be unable to prepare themselves

to testify on the topics in the Notice by the date noticed for the deposition.  (*See* May 16, 2012

Letter from Defendants to Plaintiffs, Dkt. No. 109-8.)  Plaintiffs wrote back that same day,

agreeing to provide Defendants additional time for their designee(s) to prepare for testimony

concerning the topics listed and asking Defendants to identify specific objections, assuring

Defendants that "we will, of course, consider them."  (*See* May 16, 2012 Letter from Plaintiffs to

Defendants, Dkt. No. 109-9.)  Defendants responded by sending a cursory email noting the

parties' disagreement and then filing the Supplemental Motion – *less than ten minutes later*.

(*See* May 17, 2012 Email from Defendants to Plaintiffs, Dkt No. 110-1.)

## ARGUMENT

### I.     DEFENDANTS ARE NOT ENTITLED TO ANY PROTECTIVE ORDER LIMITING DISCOVERY SEEKING DISTRICT ENVIRONMENT INFORMATION.

Information is properly discoverable not only where it is "relevant to the claim or defense

of any party[,]" but where it "appears *reasonably calculated to lead to the discovery of*

*admissible evidence*."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  *See also Lugosch v. Congel*,

218 F.R.D. 41, 45 (N.D.N.Y. 2003) ("To be relevant, the request for information must be

'germane' to the subject matter of the claim, defenses or counterclaims, though not necessarily

limited by such pleadings, and is not controlled by whether it will be admissible at trial.").  This

Court has further recognized that Rule 26 of the FRCP is to be liberally construed in favor of

allowing discovery.  *See Lugosch*, 218 F.R.D. at 46 ("In this vein, the requirement of relevancy

with regard to discovery matters should be construed liberally and with common sense.")

It bears emphasis that at this point, Plaintiffs need not demonstrate that District

Environment Information is relevant; Plaintiffs need only show that discovery seeking District

Environment Information is "reasonably calculated to lead to the discovery of admissible

evidence."  Fed. R. Civ. P. 26(b)(1).  As set forth below, however, information obtained through

this discovery is not only likely to lead to the discovery of admissible evidence – it is itself likely

to be evidence relevant to Plaintiffs' case.  Specifically, District Environment Information is

relevant to establishing at least:  (1) Defendants' notice of the hostile environment alleged in the

Amended Complaint, (2) the hostility and pervasiveness of the harassment that occurred in that

environment, (3) motive for Defendants' denials of requests for the formation of a GSA, and

(4) appropriateness of punitive damages.

    **A.**    **Discovery Seeking District Environment Information In Schools Before The Dates Of Plaintiff Pratt's Attendance Is Proper Because It Is Relevant To, *Inter Alia,* Defendants' Notice Of Harassment Or Discrimination.**

As explained in the Court's ruling denying Defendants' Motion to Dismiss Plaintiff's

Title IX claim, in order to state a claim for hostile education environment, a plaintiff must allege

that "he is a member of a protected group," that "he was subjected to unwelcome sexual

harassment" based on sex, that was sufficiently severe or pervasive so as to alter the conditions

of his education and create an abusive educational environment, and that there is a basis for

institutional liability." (Dkt. No. 77, p. 22 (citations, brackets and internal quotation marks

omitted).) "To establish institutional liability for sexual harassment under Title IX, the plaintiff

must show that an official who . . . has authority to address the alleged discrimination and to

institute corrective measures on the institutional recipient's behalf has actual knowledge of

discrimination . . . and fails adequately to respond.'" *Id.* at 23 (citation, brackets and internal

quotation marks omitted). Claims for hostile environment under 42 U.S.C. §1983 are governed

by similar principles. (*See id.* at 25 n.10.)

It is well-established that Title IX's "actual notice requirement is met when an

appropriate official 'possessed enough knowledge of the harassment that it reasonably could

have responded with remedial measures to address the kind of harassment upon which plaintiff's

legal claim is based.'" *Folkes v. N.Y. Coll. of Osteopathic Med.*, 214 F. Supp. 2d 273, 285

(E.D.N.Y. 2002) (quoting *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 320

(S.D.N.Y. 2000));[1] *See also Johnson v. Galen Health Insts., Inc.*, 267 F. Supp. 2d 679, 688

(W.D. Ky. 2003) ("Consistent with the majority of other courts, the Court thus finds that ***the***

***actual notice standard is met when an appropriate official has actual knowledge of a***

***substantial risk of abuse to students based on prior complaints by other students***.") (emphasis

added).

Evidence of other incidents – even years apart – can be relevant to whether a defendant

had notice of, and was deliberately indifferent to, discriminatory harassment. *See, e.g., Sauerhaft*

*v. Bd. of Educ.*, 05 Civ. 09087 (PGG), 2009 U.S. Dist. LEXIS 46196, *21 n.10 (S.D.N.Y. June 1,

2009) (explaining that a school district's response to harassing emails sent to plaintiff could be

deemed "deliberate indifference" based, *inter alia*, on evidence that it "chose to respond much

more quickly and thoroughly to other incidents of harassment" including a pornographic email

sent to the school's librarian "five or six years earlier"); *Ericson v. Syracuse Univ.*, 35 F. Supp.

2d 326, 328 (S.D.N.Y. 1999) (holding that allegations that defendant's employees had

investigated other students' complaints of similar harassment "for a period of 20 years" were

sufficient to show actual notice to defendant). Indeed, evidence of another student's complaints,

without more, can be sufficient to establish notice of a hostile environment sufficient to support a

finding of liability. *See, e.g., Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 63 n.6 (D. Me.

1999) (holding, in a Title IX case, that evidence of a prior report that a student other than the

plaintiff had been harassed was sufficient to establish actual notice to the defendant, even though

"Plaintiffs made no reports to school officials [and] [t]he Defendant was not notified that Doe

specifically was being subjected to a hostile environment.").

---

[1]     In *Crandell*, the court explained that "[i]t is . . . evident . . . that actual knowledge of every incident could not
possibly be required, as this would burden the plaintiff unfairly in cases of frequent harassment to report many
separate incidents to the appropriate authorities and would oblige the court to determine whether each incident
alleged was reported and therefore is actionable." 87 F. Supp. 2d at 320.

Here, Charlie Pratt asserts claims under Title IX and under § 1983 against the District and

Board for failure to provide adequate training to administrators, faculty, and staff despite

knowledge by relevant decision-makers of the hostile environment as far back as 1994.  (*See*

FAC ¶ 128.)  The harassment described by Charlie and others – including Taunee Grant,

Matthew Deem, Gregg Van Hoesen, and others – establishes both notice to Defendants of the

hostile environment and the widespread, severe, and pervasive nature of the harassment at issue.

Indeed, specific evidence from before Mr. Pratt's tenure at District schools is not only relevant,

but is highly relevant to his claims under Title IX and § 1983.  Evidence of harassment faced by

other students and their attempts to alert High School administrators to this harassment is exactly

the type  that courts use to find liability under Title IX and § 1983 and is, therefore, properly

discoverable in this case.

> **B.** **Discovery Seeking District Environment Information In Other Schools And/Or That Pre-Dates Plaintiff Pratt's Attendance At A Particular School Is Proper Because Such Evidence Is Relevant To Pervasiveness And Hostility Of The District's Environment.**

Discovery seeking District Environment Information is also permissible because it is

relevant to the question of whether the environment in the District was hostile to Charles Pratt

because he is gay, because he is male, and/or because he did not conform to stereotypes of

masculinity.  Evidence of incidents of discrimination or harassment based on these traits shows

the pervasiveness of the hostile environment, and is potentially relevant to motive and intent.

As the Second Circuit explained in a case involving a hostile-environment employment

discrimination claim under Title VII,[2] "[e]vidence of the harassment of women other than [the

plaintiff], if part of a pervasive or continuing pattern of conduct, was surely relevant to show the

---

[2]    "Courts examine Title VII precedent when analyzing discrimination "on the basis of sex" under Title IX."  (*See* Dkt. 77, p. 23 n. 9 (citing cases involving sex-based harassment).)  "Section 1983 sexual harassment claims that are based on a hostile environment theory  . . are governed by traditional Title VII hostile environment jurisprudence.  (*Id.* at p. 25 n. 10 (citations and internal quotation marks omitted).)

existence of a hostile environment at [the defendant] and could have been found probative of the company's notice of that environment within the period that the district court viewed as relevant." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir. 1997). Similarly, in the context of racial discrimination, Judge Suddaby recently observed that incidents unrelated to a plaintiff are relevant to establishing a hostile environment under Title VII: "Racially offensive comments or incidents of racial harassment, *though different in kind and occurring in different locations*, may create a racially hostile work environment in violation of Title VII." *Abdullah v. Panko Elec. & Maint., Inc.*, 3:08-CV-0579, 2011 U.S. Dist. LEXIS 29663, *40-41 (N.D.N.Y Mar. 23, 2011) (Suddaby, J.) (emphasis added); *see also Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 544-45 (S.D.N.Y. 2005) (citing cases)(footnote omitted).

Moreover, courts routinely hold that incidents of which a plaintiff may not be aware are both relevant and admissible on the issue of whether an environment is objectively hostile. As the Eighth Circuit has explained: "*[i]rrespective of whether a plaintiff was aware of the other incidents*, the evidence is highly probative of the type of workplace environment she was subjected to, and whether a reasonable employer should have discovered the sexual harassment." *Sandoval v. Am. Bldg. Maint. Indus.*, 578 F.3d 787, 802 (8th Cir. 2009) (emphasis added).

As noted above, Charlie Pratt asserts claims against the District and the Board for failure to provide adequate training to administrators, faculty and staff despite knowledge by relevant decision-makers of the hostile environment – including knowledge acquired prior to his attendance at a particular school. (*See* FAC ¶ 128.) Indeed, whether harassment continued after training of some sort was provided is itself relevant to the adequacy of Defendants' response. *See, e.g.*, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260-261 (6th Cir. 2000) ("Where a school district has actual knowledge that its efforts to remediate are ineffective, and it

continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.").

For the foregoing reasons, evidence of harassment and discrimination at all schools in the District, not only the ones attended by Charles Pratt and not only when he was in attendance, is relevant to show the need and adequacy of the steps taken by the District to combat such harassment.[3]  Moreover, Defendant Kettrick testified at his deposition that the environment at the High School with respect to gay students was the same from 1993-2006, further undermining Defendants' assertion that District Environment Information is somehow not relevant to Mr. Pratt's case.  (Kolod Decl., ¶ 4, Ex. B, Excerpt from Tr. of March 15, 2012 Deposition of James Kettrick, 133:20-25.)  Because that evidence is relevant, discovery seeking it is proper.

**C.  Discovery Seeking District Environment Information Post-Dating Plaintiff Pratt's Tenure In The District Is Proper Because The Evidence Is Relevant to Feasibility or Similar Factors.**

Discovery seeking District Environment Information of incidents and responses occurring *after* Charles Pratt's tenure in the District is also proper because it may also be relevant to his claims.  Such evidence can be used, for example, to demonstrate the reasonableness of Defendants' response to harassment and the feasibility of remedial measures.

First, as explained above, evidence that Defendants used the same methods to address discrimination and harassment after having actual notice that those methods were ineffective is

---

[3]  Defendants' mischaracterize *Leibovitz v. N.Y. City Transit Authority*, 252 F.3d 179 (2d Cir. 2001) as holding that evidence that other employees in other locations is not relevant or admissible in a hostile environment lawsuit.  *Leibovitz* held no such thing.  First, *Leibovitz* certainly did not hold that such evidence is not discoverable – that issue was not even presented.  Nor did it hold that the evidence was inadmissible – indeed, evidence that other women were harassed was admitted.  *Id.* at 183 (summarizing evidence at trial).  The issue in *Leibovitz* was whether that plaintiff – who admitted that she "was never discriminated against on the basis of her sex, nor was she personally the target of inappropriate sexual behavior" – could maintain a hostile environment claim based entirely on evidence that other women were harassed outside of her presence and without her contemporaneous knowledge.  *See id.*  The court did not suggest, much less hold, that evidence of a defendant's discriminatory treatment of others would be irrelevant to a plaintiff's claims of harassment of or discrimination against himself.

relevant to whether the Defendants "failed to act reasonably in light of the known circumstances." *Vance*, 231 F.3d at 260-261; *see also Theno v. Tonganoxi Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 965-966 (D. Kan. 2005). Mr. Kettrick testified at his deposition that even after receiving reports of serious harassment from Charles and his mother, school officials "decided we would maintain the things we are doing" rather than change their practices. (Kolod Decl., ¶ 4, Ex. B, 286:20.) Evidence of harassment and discrimination occurring after Mr. Pratt left the High School may be relevant to assessing whether Defendants' actions were reasonable.

Second, evidence of subsequent remedial measures is also relevant to assessing the feasibility of precautionary measures, should they be disputed. *See, e.g.*, *Colohan v. Genie Indus.*, 276 F.R.D. 161, 166 (S.D.N.Y. 2011) (citing Rule 407). Specifically, the response of school officers, employees, and staff to incidents of discrimination or harassment after Charles Pratt attended schools in the District may be used to show that such measures were feasible when Charles Pratt was still a student.

### D. District Environment Information Is Properly Discoverable Because It Is Relevant To Defendants' Motives In Denying Requests To Form A GSA.[4]

Plaintiffs should not be foreclosed from discovery seeking circumstantial evidence relevant to their claims based on denied requests to form a GSA. The Second Circuit has recognized that "discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Just as "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a

---

[4]   Defendants assume -- incorrectly -- that all of Plaintiffs' claims regarding the denial of their requests to form a gay-straight alliance require evidence of anti-gay animus, including on the part of Defendants Brown and Decker. (*See* Motion MOL at 16.) In fact, to establish a violation of the Equal Access Act, a defendant's motivation for denying a request to form a GSA need not be "antigay bias;" a plaintiff need only prove that the denial was content-based. 20 U.S.C. § 4071(a). Of course, as the Court previously observed, "Plaintiffs' Amended Complaint alleges that Defendants violated NYCRL §40-c(2) by subjecting Plaintiff A.E.P. to discrimination on the basis of perceived sexual orientation and anti-gay animus. (Dkt 77, p. 21.) Thus, evidence of anti-gay animus is plainly relevant to A.E.P.'s Civil Rights Law claim.

notation in an employee's personnel file, attesting to a discriminatory intent," a school administrator is unlikely to leave notes attesting to their discriminatory motive. *Id.* (citations omitted). As a result, a victim of discrimination is "seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Id.*[5]

Evidence of the environment at the High School, including incidents of harassment and any response to such incidents, is relevant to the circumstances surrounding the requests by Plaintiffs and others to form a GSA, Defendants' responses to those requests, and the reason(s) underlying Defendants' responses. Additionally, Defendants' responses to other incidents of discrimination against, or harassment of, students based on sexual orientation or gender non-conformity may be relevant to whether their response to the requests to form a GSA were discriminatory. Because such evidence is relevant, discovery seeking it is proper.

Moreover, while Plaintiffs need not demonstrate the need for a GSA, as explained below, evidence of the school environment at the time of their respective requests, and at the time of the other students' requests, is relevant to determine the extent to which Defendants' denials of those requests were "reprehensible" for purposes of their punitive damages claims.

### E. District Environment Information Is Properly Discoverable Because It Is Relevant To Plaintiffs' Claims For Punitive Damages.

Plaintiff Charles Pratt seeks punitive damages against Defendants Kettrick, Davis, Decker, Henderson, Turner, Gray and Moore, based on their discriminatory conduct and failure

---

[5]    Defendants misrepresent *Swift v. Mauro*, 5:09-cv-899 (NAM/GJD), 2008 U.S. Dist. LEXIS 52203 (N.D.N.Y. Jul. 7, 2008) as holding that certain evidence was "too tenuous to even allow discovery." (Motion MOL at 16.) In that case, the court explicitly noted that ***discovery had taken place*** before it evaluated whether the evidence was admissible. *Swift*, 2008 U.S. Dist. LEXIS 52203, *2 ("defendants submit that they provided plaintiff with discovery responses . . ."). Moreover, the defendants in *Swift* actually ***conceded*** that evidence concerning prior complaints and responses to them would have been relevant to plaintiff's claims of municipal liability, but the parties had stipulated to the dismissal of all such claims. *Id.* at *2-3. Here, Plaintiffs assert similar claims for failure to train and for practices that were tantamount to official policy. (*See* FAC ¶¶ 127-133.)

to address the harassment that he endured.  (*See* FAC, Prayer for Relief at ¶ 8.)  In addition, both Plaintiffs seek punitive damages against certain individual defendants for violation of the Equal Access Act and the First Amendment to the U.S. Constitution.  (*See* FAC, Prayer for Relief at ¶ 7 (Pratt); ¶ 11 (A.E.P.).)

     The Supreme Court has explained that evidence of similar acts is relevant to whether punitive damages should be imposed:  "Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance."  *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 577 (1996) (citations omitted).[6]  Additionally, one of the factors used to determine whether the amount of a punitive damages award is excessive is "whether a defendant engaged in repeated instances of similar misconduct."  *DiSorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) (citations omitted).

     Here, evidence regarding the adequacy of Defendants' responses, or lack thereof, to other incidents of discrimination and harassment is plainly relevant to any assessment of punitive damages.  As noted above, evidence regarding the environment at the High School goes to the reprehensibility of Defendants' conduct in denying Plaintiffs' requests to form a GSA, which is an important factor in determining whether punitive damages should be awarded for their violations of the Equal Access Act and the First Amendment.  Its discovery, therefore, is proper.

### F.    Even If District Environment Information Were Not Relevant, Efforts to Seek It Are Still Within The Scope Of Permissible Discovery.

     Even if Defendants were correct that the District Environment Information is not relevant to the claims in this litigation – and Defendants are clearly incorrect – efforts to obtain such

---

[6]    The Second Circuit has explained that "[a]lthough *Gore* examined the excessiveness of punitive damages awarded in a state court, the universal premise of Supreme Court's due process reasoning suggests that the same considerations apply equally to the review of punitive damages awarded in federal court." *Lee v. Edwards*, 101 F.3d 805, 809 n.2 (2d Cir. 1996).

evidence would still be within the scope of permissible discovery because they are "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

During the depositions of various individual Defendants, it became clear that they do not always remember when certain events occurred and whether or not Plaintiff Pratt was enrolled for instruction at and attending a particular school at a particular time.  For example, during the deposition of Defendant Patricia Henderson, she testified about an incident regarding Gregory Van Hoesen and his brother.  When asked when this incident occurred, however, she stated that she did not know whether Mr. Pratt was attending the High School at that time.  (Kolod Decl., ¶ 5, Ex. C, Excerpt from Tr. of March 30, 2012 Deposition of Patricia Henderson, 35:1-38:20.)

To the extent that Plaintiffs are foreclosed from questioning a witness about incidents of discrimination or harassment unless that witness is *certain* that Mr. Pratt was enrolled and attending the school where the incident occurred at the time, Plaintiffs will be prevented from discovering information that is reasonably calculated to lead to the discovery of admissible evidence.  With respect to the aforementioned example of Ms. Henderson, for example, there are other ways to establish whether or not Mr. Pratt was enrolled and attending the school where the incident occurred at the time of its occurrence, including through the use of documents or the testimony of other witnesses.  *See, e.g.*, *Mitchell v. Fishbein*, 227 F.R.D. 239, 249 (S.D.N.Y. 2005) (noting that "the mere fact that the documents sought by [plaintiff] do not record an applicant's race does not mean that information as to race is unavailable from other sources" in ordering discovery of documents in race discrimination action).

In sum, Defendants' misguided Motion is nothing but a transparent attempt to prevent Plaintiffs from acquiring the discovery needed to prove their claims.  As set forth above, District

Environment Information is plainly relevant to a number of Plaintiffs' claims, and Defendants'

Motion seeking to prevent Plaintiffs' discovery seeking it should be denied.

## II.     THE JANUARY 3, 2012 ORDER DOES NOT BAR DISCOVERY OF DEFENDANTS' DOCUMENT RETENTION ACTS AND PRACTICES.

Defendants' position concerning Plaintiffs' ability to conduct discovery of Defendants'

retention or destruction of documents is unclear.  Based on the objections and instructions given

at the March 22, 2012 Deposition of Defendant Jay Brown, Plaintiffs had understood

Defendants' position to be that the January 3, 2012 Order denying Plaintiffs' request for

discovery into the *privileged* aspects of Defendants' post-litigation document retention efforts is

somehow also a protective order barring discovery of the ***non-privileged*** aspects of those efforts.

But Defendants' correspondence submitted to this Court directly after Defendants' filing of the

Supplemental Motion suggests that Defendants' position is not based on how the January 3, 2012

Order should be interpreted, but on the underlying premise that information regarding what

Defendants ***actually did and did not do*** to preserve documents is generally privileged.  (*Contrast*

May 22, 2012 Letter from A. Kolod and T. Ude to Hon. Judge Dancks (Dkt. No. 110) *with* May

23, 2012 Letter from C. Spagnoli to Hon. Judge Dancks (Dkt.No. 111).)[7]  Because Plaintiffs

cannot be sure that Defendants will not also attempt to put forward arguments concerning both

positions, Plaintiffs respond to both arguments.[8]  Both positions betray a grave misunderstanding

of the law.  There is no privilege, other than that contained in the Fifth Amendment (which does

not appear to be applicable here), that allows a party to refuse to state whether or not he

destroyed a document.  Moreover, the denial of an affirmative request for access to privileged

---

[7]     In support of their Supplemental Motion Defendants appear to attempt to extend their position even farther by
opposing discovery even concerning Defendants' general pre-litigation document retention practices.  (*See* Dkt
109-10, p. 7 (objecting to deposition topic on general retention practices).)  Because there could be no basis for
such an assertion even under the January 3, 2012 order, Plaintiffs do not address this further.

[8]     Plaintiffs also note that had Defendants had complied with Local Rule 7.1 and actually explained their position
concerning the January 3, 2012 Order, this dispute could have been narrowed.  Nevertheless, Plaintiffs respond
to both arguments so as to enable the Court to address this issue.

documents and information cannot serve to bar discovery concerning related non-privileged documents and information.

### A. Information Regarding The Actual Retention Or Destruction Of Documents Within The Scope Of Discovery Is Not Privileged

Defendants' claim that "it would be impossible to draw a distinction between the [privileged and non-privileged categories of information regarding Defendants' document preservation efforts] once the litigation commenced and attorney advice had been provided" was presented for the first time in Defendants' May 23, 2012 Letter.  (Dkt. No. 111, n.10.)  This position is entirely without merit.  Plaintiffs concede that litigation hold notices are presumptively privileged.  But privilege does not preclude inquiry into what steps were actually taken by Defendants, and whether any instructions were ever given by counsel.  *See Tracy v. NVR, Inc.*, No. 04-CV-6541L, 2012 WL 1067889, at *5 -6 (W.D.N.Y March 26, 2012) (citing *Major Tours, Inc. v. Colorel,* No. 05-3091 (JBS/JS), 2009 WL 2413631 (D.N.J. Aug. 4, 2009)).  Nor does the privilege extend to information concerning "which categories of electronic storage information employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end."  *Major Tours*, 2009 WL 2413631, at *2 (citing *In re eBay Seller Antitrust Litig.*, No. 07-CV-01882 (RS), 2007 WL 2852364, at *2 (N.D.Cal. Oct. 2, 2007)).

If information regarding the actual steps taken to preserve documents post-litigation were privileged, then there would be virtually no way for a party to determine whether any steps whatsoever were ever in fact taken.  This is plainly not the law.  For example, as the court noted in *Tracy*, *supra,* in order to obtain access to presumptively privileged litigation hold notices "a party need only make a preliminary showing of spoliation, which may be established by

deposition testimony demonstrating the destruction of documents or the absence of a

preservation order." 2012 WL 1067889, at *6 (citing *Major Tours*, 2009 WL 2413631, at *2).

*Major Tours* is particularly instructive on the import of the order sought by Defendants'

motion. In that case, the court held that the moving party made a preliminary showing of

spoliation and ordered production of the opposing party's litigation hold letters. The court based

its ruling, in part, on deposition testimony by a 30(b)(6) witness, in response to an inquiry about

whether the witness was "advised by his lawyers to preserve his email communications,"

wherein the witness admitted that did not save anything. *Major Tours*, 2009 WL 2413631, at *3.

This is ***exactly*** the kind of information Plaintiffs have attempted to elicit from Defendants

in various depositions, only to have Defendants' counsel improperly shut down the line of

questioning. (*See* Dkt No. 110-2, 134:3-136:24; Kolod Decl., Ex. A, 39:10-40:11.) Defendants'

claims of privilege regarding this information are entirely without basis.

### B. The January 3, 2012 Order Is Not a Protective Order

To the extent Defendants' position is that the January 3, 2012 Order bars discovery of

non-privileged information that was already discoverable before Plaintiffs' request was denied, it

is similarly without basis. Discovery of non-privileged information was not the subject of

Plaintiffs' request or Defendants' opposition, and could not have been the subject of the January

3, 2012 Order. Because the issue of the discovery of non-privileged information regarding

Defendants' document retention practices was not submitted to Judge Lowe, his order did not –

and indeed, he was without authority to – prevent its discovery. *See U.S. v. Bonanno Organized*

*Crime Family of La Cosa Nostra*, 119 F.R.D. 625, 626 (E.D.N.Y 1988) (vacating protective

order as "prematurely issued without reference to any application" because discovery dispute

must "be before the Magistrate for the Magistrate to rule on the discovery issue.").

As explained above, Plaintiffs' submission concerning this request was limited to a

statement of the showing that is required for a party to obtain otherwise privileged information

regarding document retention.  (*See* Dec. 20, 2011 Letter from Plaintiffs to Judge Lowe, Dkt.

No. 97).  Defendants' response described the relief sought by Plaintiffs as a "request that this

Court invade the attorney-client privilege and work product protection by ordering Defendants to

disclose litigation holds and documentation preservation efforts."  (December 27, 2011 Letter

from Defendants to Judge Lowe, Dkt. No. 98.)  While Plaintiffs' letter of December 20, 2011 did

not explicitly state that the scope of the request for leave was to discover only privileged

information, such an express limitation was unnecessary; the letter was a follow-up to a

telephonic status conference with the Court where this was made clear.  And, more importantly,

there was literally no reason to seek leave of the Court in order to discover non-privileged

information.  Defendants are, therefore, entirely unreasonable to construe the denial of Plaintiffs'

request as bearing on the discoverability of non-privileged information regarding Defendants'

document preservation efforts, or lack thereof.

Defendants' retention and destruction of documents is not privileged.  No court has held

that such information is privileged – in this case or any other of which Plaintiffs are aware (or

that Defendants have cited).  Therefore, this Court should instruct Defendants to supplement

their answers and to cease refusing to answer questions concerning their acts and practices

concerning document retention.

## III.    THIS COURT SHOULD DIRECT DEFENDANTS' COUNSEL TO MEET AND CONFER WITH PLAINTIFFS' COUNSEL CONCERNING PLAINTIFFS' 30(B)(6) NOTICE, WHICH IS NOT PROPERLY BEFORE THIS COURT.

The Local Rules' meet-and-confer requirements serve at least three purposes:  first, they

avoid wasting judicial resources where disputes can be eliminated, narrowed, or better defined;

second, they avoid or at least reduce the inherent delay caused by motion practice; and, third,

they afford parties an opportunity to define the scope of their disagreement, so that each party is

clear as to what their opponent is, and is not, arguing.  Here, Defendants' failure to comply with

the Local Rules has undermined all three of these, and most notably prevented Plaintiffs from

determining what Defendants' specific objections to Plaintiffs' 30(b)(6) Notice actually are.

This Court should direct Defendants to comply with the Court's Local Rules and should refuse to

grant Defendants any relief concerning Plaintiffs' 30(b)(6) Notice.

Local Rule 7.1(b)(2) sets out requirements that parties must meet and confer before filing

a non-dispositive motion.  *See* Local Rule 7.1(b)(2).

Specifically, before a non-dispositive motion may be made, parties must:

1. "[M]ake **good faith efforts among themselves to resolve or reduce all differences relating to the non-dispositive issue.**"

2. "If, after conferring, the parties are unable to arrive at a mutually satisfactory resolution, the party seeking relief must then request a court conference with the assigned Magistrate Judge.  **A court conference is a prerequisite to filing a non-dispositive motion before the assigned Magistrate Judge**."

Local Rule 7.1(b)(2) (emphasis in original).

Local Rule 7.1(d) sets forth similar requirements that parties must follow before filing a

discovery motion.  Among other things, before filing a discovery motion, parties must:

1. "[M]ake good faith efforts among themselves to resolve or reduce all differences relating to discovery prior to seeking court intervention."  *Id.* at 7.1(d)(1).

2. "The moving party must ***confer in detail*** with the opposing party concerning the discovery issues between them in a ***good faith effort to eliminate or reduce the area of controversy*** and to arrive at a mutually satisfactory resolution.  Failure to do so may result in denial of a motion to compel discovery and/or imposition of sanctions."  *Id.* at 7.1(d)(2) (emphasis added).

3. "If the parties' conference does not fully resolve the discovery issues, the party seeking relief must then request a court conference with the assigned Magistrate Judge."  *Id.* at 7.1(d)(3).

Local Rule 7.1(d)(1)-(3) (emphasis added).

As discussed in the Background section, and set forth in Plaintiffs' May 21, 2012 letter to the Court, with respect to Plaintiffs' 30(b)(6) Notice, Defendants utterly failed to comply with this Court's Local Rules before filing the Supplemental Motion.  Specifically, in response to Plaintiffs' 30(b)(6) Notice, on May 16, 2012, Mr. Spagnoli wrote to Plaintiffs' counsel setting forth "a sample" of Defendants' concerns relating to the 30(b)(6) Notice; these included, *inter alia*, that Defendants' designee(s) would be unable to prepare themselves to testify on the topics in the Notice by the date noticed for the deposition and that the topics were overly broad.  (Dkt. No. 109-8)  Plaintiffs responded to Mr. Spagnoli's letter that same day, agreeing to provide Defendants additional time to prepare for testimony concerning the topics listed and inviting Defendants to identify specific objections, noting "we will, of course, consider them."  (*See* Dkt No. 109-9.)  Defendants responded by sending a cursory email noting the parties' disagreement and then filing the Supplemental Motion less than ten minutes later.  (*See* Dkt. No. 110-1.)

Plaintiffs submitted a letter to this Court on May 22, 2012, highlighting Defendants' noncompliance with the Court's Local Rules.  (*See* Dkt. No. 110.)  In response, Defendants submitted their own letter to the Court.  (*See* Dkt. No. 111.)  But Defendants' own letter fails to address their noncompliance with the Court's Local Rules, instead falling back on compliance "with respect to the key issues raised in the supplementation."  (*Id.* at 1.)  Such *post hoc* explanations fail for several reasons.

As an initial matter, Defendants made no good faith effort to resolve or reduce differences relating to the 30(b)(6) Notice, as required by this Court's Local Rules.  *See* Local Rule 7.1(b)(2).  The topics identified in Plaintiffs' 30(b)(6) Notice "describe with reasonable particularity the matters for examination."  Between their correspondence and their Supplemental Motion, Defendants' arguments vacillate as to what their concerns are – specifically, whether it

is that the notice seeks discovery concerning District Environment Information (addressed in

Section I, *supra*) and document retention (addressed in Section II, *supra*) – or something else.

Defendants' purported justification for filing their Supplemental Motion without a separate pre-

filing conference focuses solely on those two issues. But Defendants' Memorandum in support

of their Supplemental Motion also refers, in passing, to other objections, with varying degrees of

specificity. Defendants' May 16 letter to Plaintiffs – like their Supplemental Motion – broadly

characterizes purported concerns with the 30(b)(6) Notice without actually addressing what

Defendants could or would be willing to provide with respect to the individual topics found

therein. (*See* Supplemental Motion at 1-3; Dkt. No. 109-8.)

In addition to delaying discovery, Defendants' chosen approach has two consequences:

(1) It prevents Plaintiffs from voluntarily limiting the topics based on Defendants' explanation of

what information is available; and (2) it allows Defendants to make broad, nonspecific

complaints about the topics that preclude Plaintiffs from being able to provide meaningful

responses to those complaints.

First, Defendants fail to acknowledge, much less address, the fact that Plaintiffs'

approach of describing the topics with particularity but using appropriately broad terminology is

necessary, because Defendants – not Plaintiffs – know Defendants' practices with respect to, for

example, the adoption of policies to prevent harassment and bullying. (*See* 30(b)(6) Notice,

Topic 1, Dkt. No. 109-2.) In the unlikely event that Defendants District and Board revisit

harassment policies frequently, it may be appropriate for Plaintiffs to agree to limit questions

about changes to Defendants' harassment policies to one or more narrower time periods, rather

than 1990 through present. But if Defendants District and Board have revisited harassment

policies only a handful of time from 1990 through present, questioning related to those few

occasions is not overly burdensome.[9]  Moreover, because Defendants have asserted that they

retain no copies of any superseded policies (*See* September 23, 2011 Letter from Defendants to

Plaintiffs, p. 2, Dkt. No. 110-3), Plaintiffs have no other discovery vehicle to obtain this

information about the District's policies that were in effect while Plaintiffs were enrolled there.[10]

Second, Defendants' approach improperly allows them to attack Plaintiffs' topics broadly

and nonspecifically even where Defendants' purported concerns have no application.  For

example, many of Plaintiffs' topics are substantially more time limited than others, which

Defendants fail to acknowledge, much less address.  (*See, e.g.*, 30(b)(6) Notice, Topic 11

(seeking knowledge concerning the formation of non-curriculum-related student groups from

August 2001-June 2011.), Dkt. No. 109-2.)  Meanwhile, other topics simply have not been

addressed at all.  (*See, e.g.*, 30(b)(6) Notice, Topic 18 (seeking knowledge concerning the

District's Press Release of April 8 or 9, 2009, Dkt. No. 109-2).)  Moreover, this Court's Local

Rules require a moving party to "***confer in detail***" to eliminate or reduce the area of controversy

before seeking court intervention.  Local Rule 7.1(d)(2).  Defendants' conduct is simply

indefensible; many of the issues raised concerning the 30(b)(6) Notice are generally resolved

during a meet and confer process – and should be so resolved here.

In addition, Defendants failed to follow this Court's Local Rules because they failed to

seek a Court conference before filing the Supplemental Motion.  *See* Local Rule 7.1(d)(1).

Defendants' only defense on this front is to point to three telephonic conferences – ***all of which***

***predated the Plaintiffs' 30(b)(6) Notice*** – as somehow absolving Defendants of their obligation

---

[9]  Several policies produced in discovery were adopted years ago and only revised once.  For example, the policy entitled "Sexual Harassment/Employees" is annotated "Adopted 5/14/92, Revised 05/20/04;" File YY, pp 3-4 (Kolod Decl., ¶ 6, Ex. D); the policy entitled "Harassment/Students" is annotated "Adopted 01/04/96; Revised 05/20/04." File YY, pp. 33-35 (Kolod Decl. ¶ 7, Ex. E.)

[10]  As noted, Plaintiff Charlie Pratt attended schools in the District from 1993 to 2004, and A.E.P. attended schools until 2011.

to follow this Court's Local Rules.  But the Local Rules are clear:  **"A court conference is a prerequisite to filing a non-dispositive motion before the assigned Magistrate Judge**."  *Id.* at 7.1(b)(2) (emphasis in original); *see also id.* at 7.1(d)(3).  Under this Court's Local Rules, it would have been entirely improper for Defendants to have filed a stand-alone non-dispositive/discovery motion concerning Plaintiffs' 30(b)(6) Notice; it is just as improper for Defendants to piggyback the issue on the Motion.

Plaintiffs respectfully request that the Court direct Defendants to meet and confer with Plaintiffs concerning the 30(b)(6) Notice, so that the parties can resolve, reduce, or at least define the scope of their disputes concerning the topics identified.

## CONCLUSION

For the foregoing reasons, Defendants' Motion and Supplemental Motion should be denied in their entirety and this Court should direct Defendants to confer with Plaintiffs' counsel and grant any other relief this Court may deem proper.

Dated:   June 4, 2012
New York, NY

/s/ Alexandra P. Kolod

Thomas W. Ude, Jr., Bar Number 515867
Hayley Gorenberg, Bar Number 515453

*Attorneys For Plaintiffs*

LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, Suite 1500
New York, NY 10005-3904
Telephone:  (212) 809 - 8585
Facsimile:  (212) 809 - 0055

Vickie Reznik (*admitted pro hac vice*)
Adam T. Humann (*admitted pro hac vice*)
Lisa LeCointe-Cephas (*admitted pro hac vice*)
Robert Gretch (*admitted pro hac vice*)
Alexandra P. Kolod (*admitted pro hac vice*)

*Attorneys for Plaintiffs*

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone:  (212) 446 - 4800
Facsimile:  (212) 446 - 4900

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES PATRICK PRATT and
A.E.P. through her parents and next friends
Bobbi Lynn Petranchuk and Todd Edward
Petranchuk,

                Plaintiffs,

    - vs. -

INDIAN RIVER CENTRAL SCHOOL
DISTRICT; INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central School
District, in his official and individual
capacities; TROY DECKER, Principal of
Indian River High School, in his official and
individual capacities; and JAY BROWN,
JOHN DAVIS, KENDA GRAY, AMABLE
TURNER , PATRICIA HENDERSON and
BRIAN MOORE, in their individual
capacities,

                Defendants.

**7:09-cv-411 (GTS/TWD)**


**CERTIFICATE OF SERVICE**

---

       I hereby certify that on June 4, 2012, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

1. Frank W. Miller
   Charles Spagnoli
   Brian Georgiady
   The Law Firm of Frank W. Miller
   6575 Kirkville Road
   East Syracuse, New York 13057
   fmiller@fwmillerlawfirm.com
   bgorgiady@fwmillerlawfirm.com
   Attorneys for Defendants

2. Hayley Gorenberg
   Thomas W. Ude, Jr.
   Lambda Legal
   120 Wall Street
   Suite 1500
   New York, NY 10005
   TUde@lamdalegal.org
   Attorneys for Plaintiffs

3. Vickie Reznik
   Adam Humann
   Lisa LeCointe-Cephas
   Maura Klugman
   Robert Gretch
   Kirkland & Ellis LLP
   601 Lexington Avenue
   New York, NY 10022
   vickie.reznik@kirkland.com
   adam.humann@kirkland.com
   lisa.lecointe-cephas@kirkland.com
   maura.klugman@kirkland.com
   robert.gretch@kirkland.com
   Attorneys for Plaintiffs

4. William F. Larkin
   Assistant U.S. Attorney
   P.O. Box 7198
   100 S. Clinton Street
   Syracuse, NY 13261-7198
   william.larkin@usdoj.gov
   Attorneys for Plaintiff United States of America


                                        __s/ Alexandra P. Kolod_____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

CHARLES PATRICK PRATT and
A.E.P. through her parents and next friends Bobbi Lynn
Petranchuk and Todd Edward Petranchuk,

        Plaintiffs,

    - vs. -

INDIAN RIVER CENTRAL SCHOOL
DISTRICT; INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK, Superintendent of
Indian River Central School District, in his official and
individual capacities; TROY DECKER, Principal of
Indian River High School, in his official and individual
capacities; and JAY BROWN, JOHN DAVIS, KENDA
GRAY, AMABLE TURNER, PATRICIA HENDERSON,
and BRIAN MOORE, in their individual capacities,

        Defendants.

7:09-cv-411 (GTS/TWD)
ECF Case

**DECLARATION OF
ALEXANDRA P. KOLOD IN
SUPPORT OF PLAINTIFFS'
OPPOSITION TO
DEFENDANTS' SECOND
AMENDED MOTION IN
LIMINE AND FOR A
PROTECTIVE ORDER**

Alexandra P. Kolod, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am an associate of the law firm of Kirkland & Ellis LLP, counsel of record for Plaintiffs in the above-captioned matter.

2.     I make this affirmation to verify the authenticity of the documentary evidence referenced in Plaintiffs' Opposition to Defendants' Second Amended Motion In Limine and for a Protective Order.

3.     A true and correct copy of excerpts from the May 11, 2012 Deposition of Kenda Gray is attached hereto as Exhibit A.

4.     A true and correct copy of excerpts from the March 15, 2012 Deposition of James Kettrick is attached hereto as Exhibit B.

5.     A true and correct copy of excerpts from the March 30, 2012 Deposition of Patricia Henderson is attached hereto as Exhibit C.

6.    A true and correct copy of the document entitled "Sexual Harassment/Employees," which is pages 3-4 of the document produced by Defendants labeled "File YY," is attached hereto as Exhibit D.

7.    A true and correct copy of the document entitled "Harassment/Students," which is pages 33-35 of the document produced by Defendants labeled "File YY," is attached hereto as Exhibit E.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  June  4, 2012
              New York, NY

Alexandra P. Kolod
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
E-mail:  alexandra.kolod@kirkland.com

2

Exhibit A - Excerpt from Transcript of
May 11, 2012 Deposition of Defendant
Kenda Gray

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

------------------------------------------------X

CHARLES PATRICK PRATT and A.E.P. through her
Parents and Next Friends BOBBI LYNN PETRANCHUK
and TODD EDWARD PETRANCHUK,

                    Plaintiffs,

        -vs-              7:09-cv-411 (GTS/TWD)

INDIAN RIVER CENTRAL SCHOOL DISTRICT; INDIAN
RIVER CENTRAL SCHOOL DISTRICT BOARD OF
EDUCATION; JAMES KETTRICK, Superintendent of
Indian River Central School District, in his
official and individual capacities; TROY
DECKER, Principal of Indian River High School,
in his official and individual capacities; and
JAY BROWN, JOHN DAVIS, KENDA GRAY, AMABLE
TURNER, PATRICIA HENDERSON and BRIAN MOORE, in
their individual capacities,

                    Defendants.
------------------------------------------------X

DEPOSITION OF KENDA GRAY

Syracuse, New York

Friday, May 11, 2012

2:14 p.m.

REPORTED BY:

HANNAH KLASEN

REF: 7423B

1    Q.   Do you delete -- do you delete them every

2    time?

3    A.   No.

4    Q.   I'm sorry, you just answered that.

5    A.   No.

6    Q.   Where do you save them?

7    A.   I have little files on my -- the side of my

8    computer because I keep all my e-mails from my coaches

9    because I have all their names broken down.

10   Q.   Where do you keep the e-mails pertaining to

11   student discipline?

12   A.   They're right under my own file.  I'm not

13   100 percent sure without looking at my computer because

14   I haven't wroten [phon] anybody up, so I haven't had to

15   save any this year.

16        Every year, we clean out our files.  I just

17   delete all my files on the computer.

18   Q.   When's the last time you deleted all of your

19   files from the computer?

20   A.   From --

21             MR. SPAGNOLI:  I'm going to object

22             to this line of questioning as it gets

23             into the question of document

24             preservation, which is contrary to the

25             Court's order of January 3, 2012 as

Page 40

1          beyond the scope of discovery permitted

2          to plaintiffs.

3               MR. GRETCH:  I can't ask whether

4          she deleted documents pertaining to

5          student discipline?

6               MR. SPAGNOLI:  If you want to

7          confine your question to prior to the

8          start of this litigation, I would view

9          that as outside the scope of the order,

10         but beyond that -- I've given you some

11         latitude on this, counsel.

12               MR. GRETCH:  Let's take a break.

13               MR. SPAGNOLI:  Okay.

14          (Time noted:  2:54 p.m.)

15          (Whereupon, a short recess was

16     held.)

17          (Time noted:  3:00 p.m.)

18               MR. GRETCH:  Okay.  Where we left

19          off, I think Mr. Spagnoli had an

20          objection to me asking questions about

21          the deletion of documents after the

22          commencement of the lawsuit as being, I

23          think, forbidden by the Court's, was it,

24          January 3rd order, do I have that

25          correct?

Exhibit B - Excerpt from Transcript of March 15, 2012 Deposition of James Kettrick

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------

CHARLES PATRICK PRATT and A.E.P.
through her Parents and Next Friends
BOBBI LYNN PETRANCHUK and TODD EDWARD
PETRANCHUK,

                Plaintiffs,

     -vs-       7:09-CV-411 (GTS/TWD)

INDIAN RIVER CENTRAL SCHOOL DISTRICT;
INDIAN RIVER CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION; JAMES KETTRICK,
Superintendent of Indian River Central
School District, in his official and
individual capacities; TROY DECKER,
Principal of Indian River High School,
in his official and individual
capacities; and JAY BROWN, JOHN DAVIS,
KENDA GRAY, AMABLE TURNER, PATRICIA
HENDERSON and BRIAN MOORE, in their
individual capacities,

                Defendants.

--------------------------------------------------

DEPOSITION OF JAMES KETTRICK

Syracuse, New York

March 15, 2012

9:29 a.m.

REPORTED BY:

PAMELA PALOMEQUE

REF: 7002

Page 133

1          A.     I -- improve the climate?  I didn't think the
2     climate was bad when I was there.
3          Q.     Do you think that people were more accepting
4     of gay students in 2006 when you left than they were in
5     2000 or no difference?
6          A.     I would say no difference.  The students
7     really got along in Indian River.  It's a very diverse
8     population.  I was pretty proud of that.
9          Q.     Have things changed substantially since you
10    left or has it remained largely the same?
11         A.     I would say in the last two years particularly
12    there's a tremendous amount of national attention on
13    bullying.  And gay rights at this point is -- stands at
14    the forefront of civil rights actions.
15              The anti-bullying -- the high profile suicides
16    that have taken place the last couple years, Tyler
17    Clementi, Jamey Rodemeyer, that schools are at the
18    epicenter of this problem and we need to make sure we're
19    addressing bullying.
20         Q.     Is your view on the environment of the high
21    school while you were principal with respect to gay
22    students, do you think it was the same throughout, from
23    '93 to 2006?
24              MR. SPAGNOLI:  Objection to form.
25         A.     I would say the same.

Case 7:09-cv-00414-GTS-TWD  Document 126-13  Filed 06/49/12  Page 42 of 56

Page 286

1    information about and we are -- we are out assessing the

2    school climate at all times and everything that we do in

3    the building is an ongoing assessment of what the tenor

4    of the building is, how the students are behaving in

5    relation to each other and the concerns that she

6    basically was addressing are addressed anyway in the --

7    in each September's conference, with teachers or training

8    session first day of school.

9         Q.    After your January 9th meeting with Bobbi and

10   being presented with Kettrick Exhibit 9, did you consider

11   you might need to do something different than just that?

12                    MR. SPAGNOLI:  Objection to form.  Go

13                    ahead.

14        A.    At the meeting of October 9th what the intent

15   to do was to have Charlie come back and give us -- to get

16   acclimated to school and work with us to identify

17   specific individuals, okay, specific instances or

18   teachers or anything where we would have some specificity

19   of what is being presented on these two pages.

20        Q.    And that's fine.  I just want to know after

21   your January 9th meeting with Bobbi and being presented

22   with Kettrick Exhibit 9, you considered doing something

23   other than the training and the monitoring that you'd

24   done to that point?

25                    MR. SPAGNOLI:  Objection to form.

Case 7:09-cv-00411-GTS-TWD Document 26-13 Filed 06/04/12 Page 43 of 56

1    A.    We decided we would maintain the things we are

2   doing to educate staff and students about our insistence

3   they behave in an appropriate manner and do not engage in

4   anything of a harassing nature or a discriminatory

5   nature.

6    Q.    Did you consider anything else in addition to

7   that?

8    A.    We always keep an open mind.  At that point

9   we -- we kept doing what we were doing and not anything

10   else.

11    Q.    And nothing more.  So what happened after you

12   sent Bobbi this letter of February 9th, 2004?

13             MR. SPAGNOLI:  Objection to form.  Can

14             you be a little more specific, Counsel.

15    Q.    Do you understand the question?

16    A.    Could you be a little more specific?

17    Q.    If you don't understand the question, please

18   let me know and I'll be happy to rephrase.

19    A.    Thanks.

20    Q.    What occurred with respect to Charlie and his,

21   you know, educational career after this letter of

22   February 9th, 2004?

23             MR. SPAGNOLI:  Objection to form.

24    A.    A contact was made by Bobbi with Mrs. Dobmeier

25   to begin an online homeschooling.

# Exhibit C - Excerpt from Transcript of March 30, 2012 Deposition of Patricia Henderson

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

7:09-cv-411

CHARLES PATRICK PRATT and A.E.P. through her parents and
next friends Bobbi Lynn Petranchuk and Todd Edward
Petranchuk,

        Plaintiffs,

   vs.

INDIAN RIVER CENTRAL SCHOOL DISTRICT; INDIAN RIVER
CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION; JAMES
KETTRICK, Superintendent of Indian River Central School
District, in his official and individual capacities;
TROY DECKER, Principal of Indian River High School, in
his official and individual capacities; and JAY BROWN,
JOHN DAVIS, KENDRA GRAY, AMABLE TURNER, PATRICIA
HENDERSON, and BRIAN MOORE, in their individual
capacities,

        Defendants.


     VIDEOTAPED DEPOSITION OF PATRICIA HENDERSON
              8:49 a.m.
           March 30, 2012
       6565 Americas Parkway, NE
            Suite 200
       Albuquerque, New Mexico


    THIS DEPOSITION WAS TAKEN BY:

    ALEXANDRA P. KOLOD
    ATTORNEY FOR PLAINTIFFS



REPORTED BY:  Deborah E. Trattel, NM CCR #153


Ref: 7080

1          Greg was in the hallway, Mr. Davis and I were

2     out into the hall because in between classes, we all

3     stand in the hallway for the flow of the students.

4          And Mr. Davis and I said "Greg, could we speak

5     to you for a second?"

6          And Greg said, "I don't want to do it right

7     now."

8          I said, "Well, what is wrong?"  I said, "Let's

9     go into Mr. Davis's office out of the hallway" and we

10    walked into the hallway and down to the main office and

11    went in.  And he said "I've been having a fight with my

12    brother."

13    Q.    Did he say what the fight was about?

14    A.    Yes, his brother was calling him names.

15    Q.    What kind of names?

16    A.    Fudge pucker.  And I said to Greg, "Why now?"

17          He said, "Because that's the way he is with

18    me."

19          And Mr. Davis and I said, "We're going to call

20    your brother down here and get it straightened out."

21          I said to him, "When did this all take place?"

22          He said, "This morning when I got here."

23          Greg had explained that he had run into Glen

24    near the gym area.  And I don't know the full argument,

25    what it was about.  And Glen had said that to him and

1  had hurt his feelings.  And Mr. Davis and I called Glen

2  down to the main office and put -- said to Greg, "You

3  can go back to class."

4        And Glen came in and we asked him.  And he

5  said, "It's just a family fight."

6        And Mr. Davis said, "I won't have that here.

7  That name calling is going to stop.  It's going to end

8  today" and he ripped Glen up one side and down the

9  other.

10        And I said to Glen about hurting his brother's

11  feelings.  And he said actually, it was none of my

12  business.  And I said it is my business when his day has

13  been ruined like this.

14     Q.   Was any discipline imposed on Glen?

15     A.   Yes.

16     Q.   What happened?

17     A.   I believe it was structured as an in-school

18  suspension.

19     Q.   Do you know if it --if it was written up?

20     A.   That, I don't recall.  I don't know whether or

21  not there was a write-up.  I can't say.

22     Q.   Is there usually a written record of in-school

23  suspension?

24     A.   Not all the time.

25     Q.   Not all the time.  You said that we all stand

1    in the hallways when classes change.  Who is "we"?

2         A.    The administration.

3         Q.    Can you --

4         A.    Principals, myself.

5         Q.    Can you list all the people by name?

6         A.    Mr. Davis, Mr. Kettrick, Mr. Brown, Mr. Decker.

7         Q.    Anybody else?

8         A.    Occasionally teachers.

9         Q.    Is this during every class change?

10        A.    Yes.  And lunches.

11        Q.    Does the administration all stand in the same

12   place or in different places?

13        A.    No.  Everyone's spread out.

14        Q.    Do you know -- any other interactions with Greg

15   after that?

16        A.    Uh-hmm, not that I recall, no.

17        Q.    Any others before that?

18        A.    Just when he and Seth had the fight.

19        Q.    How did you know that it was out of character

20   for Greg to be yelling?

21        A.    Greg was always happy.  Greg always went out of

22   his way to make -- if he saw an adult or another

23   student, it was -- he always went out of his way and was

24   always happy.  He was bubbly.

25             MR. SPAGNOLI:  Make sure you let her finish her

Page 38

1    question before you start your answer.

2            THE WITNESS:  Okay.

3        Q.   And after this incident involving his brother

4    Glen, was he happy and bubbly again?

5            MR. SPAGNOLI:  Objection to form.

6        A.   That was late afternoon by the time that Glen

7    was spoken to.

8        Q.   I mean in the weeks and months later.  Did he

9    go back to the way he had been before?

10           MR. SPAGNOLI:  Objection to form.

11       A.   I didn't pay attention personally to him.

12       Q.   And when did this incident happen; do you

13   remember?

14       A.   It had to be 2003.

15       Q.   Do you remember what time of year?

16       A.   No, it wasn't 2003 with the argument with his

17   brother.  That was 2002?

18       Q.   Do you know if Charlie was in school yet, at

19   the high school yet?

20       A.   I don't know.

21           MR. SPAGNOLI:  I'm not sure the witness

22   finished her answer to the prior question.  Had you

23   finished your answer when you said this was '02?

24       A.   I'm trying to go by memory.  The years.  It was

25   -- with his brother, I believe it was '02.

# Exhibit D - District Policy Entitled "Sexual Harassment/Employees"

# INDIAN RIVER CENTRAL SCHOOL DISTRICT

**0110**

## SEXUAL HARASSMENT/EMPLOYEES

Sexual harassment violates Federal and State Law and may subject the harasser to personal civil and/or criminal liability. In addition, it is the policy of this District to maintain a working environment that is free from sexual harassment. As such, any form of sexual harassment is strictly prohibited and will result in appropriate disciplinary action.

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

    1.    Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or

    2.    Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or

    3.    Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Each supervisor and administrator shall make all reasonable efforts to ensure that sexual harassment does not occur. If any supervisor or administrator is aware, either by receipt of a formal or informal complaint or by observation, of any possible incident of sexual harassment, it shall promptly be referred to the District's Human Rights Officer for investigation. Failure to refer any complaint or report of sexual harassment shall result in disciplinary action.

Any employee who feels that he or she is subject to sexual harassment at work from a supervisor, co-employee or any other person in the work place should immediately report the alleged incident either to that person's direct supervisor or the District's Human Rights Officer.

Any third person with knowledge or belief of conduct that constitutes sexual harassment should immediately report the alleged incident to his or her direct supervisor or the District's Human Rights Officer. In the event that the Human Rights Officer or direct supervisor is the alleged harasser, the report should be directed to the Superintendent of Schools. Reports may be made verbally or in writing.

All reports shall be confidential and disclosed only on a "need to know" basis, consistent with the District's obligation to investigate the report and take appropriate action.

All reports shall be immediately, and objectively, investigated by the District's Human Rights Officer in accordance with the procedures developed by the Superintendent of Schools to determine the appropriate correction (if any) which shall be taken.

Case 7:09-cv-00411-GTS-TWD   Document 113-5   Filed 06/04/12   Page 3 of 3

**SEXUAL HARASSMENT/EMPLOYEES**                              **Page 2 of 2**

The Director of Human Resources is designated as the District's Human Rights Officer, and the office is located in the district office complex, located in the Middle School, Philadelphia, NY 13673.  The telephone number is 642-3441.

Submission of a report of sexual harassment shall not in any way affect the individual's employment or work assignment.

Adopted:       5/14/92
Revised:       5/20/04

# Exhibit E - District Policy Entitled "Harassment/Students"

# INDIAN RIVER CENTRAL SCHOOL DISTRICT

**7580**

## HARASSMENT/STUDENTS

The Board of Education affirms its commitment to non-discrimination and recognizes its responsibility to provide for all District students an environment that is free of harassment and intimidation violence or discrimination.

Sexual harassment, discrimination and violence are violations of law and stand in direct opposition to District policy. Therefore, the Board will not tolerate and strictly prohibits these actions in the educational environment, including sexual harassment, by employees and students.

Generally, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

a. Submission to such conduct is a condition for the receipt of a particular grade or award for any course of study, educational or extracurricular activity, including the acceptance into or rejection from such course or activity; or

b. Such conduct has the purpose or effect of unreasonably interfering with a student's academic performance or participation in an educational or extracurricular activity or creating an intimidating, hostile or offensive learning environment. The term "sexual harassment" does not refer to occasional complaints of a socially acceptable nature.

Sexual harassment may also include:

a. Verbal harassment or abuse,

b. Unwelcome pressure for sexual activity,

c. Inappropriate or unwelcome pulling, patting, pinching or touching of a person or clothing,

d. Demanding sexual favors, accompanied by implied or overt threats concerning an individual's employment or educational status,

e. Demanding sexual favors, accompanied by implied or overt promises of preferential treatment with regard to an individual's employment or educational status,

f. Sexual violence, which is a physical act of aggression that includes a sexual act or purpose.

Harassment is not limited to harassment of a sexual nature. The following may also constitute harassment when related to one's sex, race, creed, color, religion, sexual orientation, marital status, veteran status, military status, or disability:

a. Name-calling, jokes or rumors,

b. Graffiti

c. Notes or cartoons,

d. Offensive or graphic posters, book covers, or other items of a similar nature and purpose,

e. Words or actions that make you feel uncomfortable, embarrass you or hurt your feelings.

**HARASSMENT/STUDENTS**                                                        **Page 2 of 3**

Discrimination include actions taken or decisions made by district employees/officials that are based, in whole or in part, on an individual's membership in one of the following protected categories:   race, religion, disability, gender, military/veteran status or sexual orientation as well as any other legally protected category.

Any student who feels that he or she has been the victim of harassment, discrimination or violence by another student or an employee of the district, or any third person with knowledge or belief of conduct which may constitute these illegal and appropriate actions, should report the alleged acts immediately to an appropriate school district official as designated by this policy.

Reports of harassment, discrimination or violence may be made verbally or in writing. The building principal is the person responsible for receiving such reports at the building level. If the complaint involves the building principal, the complaint should be filed directly with the Human Right's/Title IX Officer.  If the complaint involves the Human Right's/Title IX Officer, it should be filed directly with the Superintendent.

Any teacher who suspects that a student has been subject to sexual harassment by any person in the school environment shall immediately file a report.  If the District has knowledge of or has reason to know of any alleged sexual harassment, they will investigate such conduct promptly and thoroughly.

All reports and investigations shall remain confidential to the extent possible and disclosed only when necessary for the District to conduct a full and thorough investigation of the repot and to take appropriate action.  Should the offending individual be a school employee, appropriate disciplinary measures will be applied, up to an including termination of the offender's employment in accordance with contractual and legal guidelines.  Should the individual be a student, appropriate disciplinary measures will be applied, up to an including suspension and/or expulsion.

The Board prohibits any retaliatory behavior directed against complaints and/or witnesses.  Follow up inquiries shall be made to ensure that harassment has not resumed and that the victims and/or witnesses have not suffered retaliation.

The Board directs the Superintendent to develop regulations for resolving harassment, discrimination and complaints of violence by students.    At least annually, the Superintendent/designees(s) shall affirmatively discuss these topics with all employees, reinforce the District's condemnation of such conduct and explain the related sanctions.  A copy of this policy and its accompanying regulations shall be available upon request to students and employees of the district.  A summary of this policy shall be posted in appropriate places and reproduced in the Student Handbook.

**HARASSMENT/STUDENTS**                                    **Page 3 of 3**

      The Director of Human Resources is designated as the District's Human Rights Officer. The office is located in the district office complex located in the Middle School, Philadelphia, NY 13673. The telephone number is 315-642-3441.

Adopted:      01/04/96
Revised:      05/20/04